[S. F. No. 22659. In Bank. Jan. 30, 1970.]

NATIONAL ADVERTISING COMPANY, Plaintiff and Respondent, v. COUNTY OF MONTEREY et al., Defendants and Appellants.

## COUNSEL

William H. Stoffers, County Counsel, and John O. Thornberry, Assistant County Counsel, for Defendants and Appellants.

Harry S. Fenton, Kenneth G. Nellis and David H. Frederickson as Amici Curiae on behalf of Defendants and Appellants.

Hoge, Fenton, Jones & Appel and Charles R. Keller for Plaintiff and Respondent.

## OPINION

**BURKE, J.**—Defendant county appeals from a judgment declaring certain provisions of its zoning ordinance to be null and void and enjoining enforcement thereof as against plaintiff outdoor advertising company. As will appear, we have concluded that the removal requirements of the ordinance may validly be applied to certain of plaintiff's billboards, but that as to others removal should await expiration of appropriate amortization periods.

Plaintiff owns and maintains outdoor advertising billboards which it erected on various parcels of private property that it holds under lease in defendant county. The advertising space provided by these outdoor structures is in turn rented out by plaintiff. Such advertising is known as off-site; i.e., it does not, in the language of defendant's zoning ordinance involved herein, "relate only to goods sold or services rendered upon the building site on which said sign is erected."

In 1955 defendant county adopted a comprehensive zoning ordinance which divided the county into various zones or districts, in only three of which were off-site signs permitted. Plaintiff had billboards in all of the prohibited districts, including districts unclassified as to use and called U districts by the ordinance. Section 12 of the ordinance prohibited the off-site signs in U districts, and section 34 provided that nonconforming uses under the ordinance, including then existing off-site signs in prohibited districts, must be removed after five years.

On appeal in a prior action between the same parties (*National Advertising Co.* v. *County of Monterey* (1962) 211 Cal.App.2d 375 [27 Cal. Rptr. 136]) both sections were held to be valid, except that portion of section 34 which required the removal of signs from U districts. With respect to the five-year amortization period, the opinion notes that zoning

legislation may validly provide for the eventual discontinuance of non-conforming uses within a prescribed reasonable amortization period commensurate with the investment involved (*Livingston Rock etc. Co.* v. *County of Los Angeles* (1954) 43 Cal.2d 121, 127 [4] [272 P.2d 4]; *City of Los Angeles* v. *Gage* (1954) 127 Cal.App.2d 442, 454-460 [274 P.2d 34]); that one who attacks a zoning ordinance as unreasonable bears the burden of establishing this claim (*Beverly Oil Co.* v. *City of Los Angeles* (1953) 40 Cal.2d 552, 559 [6] [254 P.2d 865]; *Wilkins* v. *City of San Bernardino* (1946) 29 Cal.2d 332, 338 [3] [175 P.2d 542]); and that with respect to such of plaintiff's prohibited billboards as were located in other than U districts plaintiff had failed to show the costs of the structures, dates of construction or remaining useful life, or to otherwise establish that the amortization period of five years was unreasonable. (Pp. 380-381 [7-9] of 211 Cal.App.2d.) Accordingly, section 34 of the ordinance was upheld insofar as it required the removal of billboards in six districts in which the ordinance detailed the character of the district and the uses permitted therein.

With respect to U districts, the opinion in the earlier appeal pointed out that under the ordinance U districts were designed as holding areas whose rural character was to be maintained only until some definite trend toward particular uses began to develop, and that some of the U areas might develop as commercial or industrial zones in which billboard signs were permitted. The court reasoned, accordingly, that it was unreasonable "to require removal of such signs in areas whose ultimate use is not now determinable. Upholding that portion of the removal requirement could well result in destruction today of a sign which could be rebuilt in the near future. When a particular 'U' district has developed sufficiently to warrant placing it in a specific district, it will be time enough to resort to the remedy of removal." (P. 382 [10] of 211 Cal.App.2d.)

The present litigation involves some 42 of plaintiff's billboards located in U districts, and grows out of amendments to defendant's zoning ordinance. In 1964 section 34 was amended to provide in pertinent part that all billboards in a U district "shall be removed entirely within *one* year from the date said property is reclassified into some other zoning district. . . ." (Italics added.) In April 1965 the ordinance was again amended to provide, inter alia, that an N zoning district was established as a rural area in which billboards were not permitted.

As a result of this rezoning, 41 of the subject billboards were placed in an N district and the other was placed in a PC (planned commercial) district. In the PC district no use is permitted except as part of a comprehensive, all-over development plan which has been approved by the county

zoning authorities. When the amendments became effective in May 1965, the one-year removal period thus commenced with respect to plaintiff's 42 signs involved here, and plaintiff instituted this suit to enjoin enforcement of the removal provisions.

The contracts under which plaintiff rents out advertising space on the billboards are for minimum periods of three and four years, under which no profit is usually made until the third year. The boards were constructed and erected during the years 1933 to 1950 at a cost varying from $360 to $2,600 each. The trial court found that at a "high" cost the boards have also been carefully maintained through repair and in many instances have been rebuilt and "have accordingly many years of useful life remaining"; that plaintiff's business also "requires it to prorate a proportionate cost of its considerable overhead expenses to each sign location and over the period of each sign lease"; that the cost of removal of the signs would be $5,850. The trial court held that the 1965 zoning reclassification was valid, but that the 1964 amendment to section 34 was invalid in that the one-year amortization provision for removal of non-conforming signs was unreasonable and arbitrary under the circumstances, and represents the taking of property without due process of law. Judgment was entered enjoining enforcement of the removal provisions as to plaintiff, and this appeal by defendant followed.

■ In determining whether the amortization period prescribed by legislation which provides for the eventual discontinuance of nonconforming uses is reasonable and commensurate with the investment involved and so may validly apply to the particular property and use at issue, each case must be determined on its own facts. (*Livingston Rock etc. Co.* v. *County of Los Angeles, supra,* 43 Cal.2d 121, 126; *Beverly Oil Co.* v. *City of Los Angeles, supra,* 40 Cal.2d 552, 560; *City of La Mesa* v. *Tweed & Gambrell Planing Mill* (1956) 146 Cal.App.2d 762, 770 [304 P.2d 803]; see also *City of Santa Barbara* v. *Modern Neon Sign Co.* (1961) 189 Cal.App.2d 188 [11 Cal.Rptr. 57]; *City of Los Angeles* v. *Gage, supra,* 127 Cal.App.2d 442.) ■ Plaintiff's burden here is to establish the invalidity of the ordinance in its application to plaintiff's property. (*Beverly Oil Co.* v. *City of Los Angeles, supra,* at p. 559.)

From the record it appears that nine of plaintiff's billboards are supported by single steel posts, five of them by either two or three timber posts, and the remainder vary in size from 6 feet by 10 feet to 15 feet by 60 feet with up to seven supporting timbers each. The sign panels are made of either steel, plywood or masonite. Plaintiff's amortization evidence was to the effect that under rules of the federal Internal Revenue Service plaintiff is required to amortize the costs of its signs over periods ranging

from 10 years to 25 years, depending on the type of construction. As of December 1966, 31 of the signs had been fully amortized on this basis, 9 of them had either 5 or 6 years of remaining unamortized life, and the other 2 had 8 and 9 years, respectively.

Plaintiff's witness testified that because of exposure of the signs to the elements, plaintiff is constantly repairing them "within the limits of the ordinance . . . but no major repairs, because all we can do is maintain it." However, these repairs actually add to the useful life of the signs, and plaintiff claims that the signs have a "book value" which "represents a true, existing capital investment . . . which cannot in most instances be further depreciated." The amount of this so-called book value is listed by plaintiff at 40 percent of the original cost of each sign regardless of age, including the 31 which as stated have been fully amortized, and is supported by nothing more than plaintiff's bare assertion. Plaintiff produced no evidence with respect to present actual value of any of the signs, or relating to amortization of any such value.

It is apparent that plaintiff has totally failed to show arbitrariness and unreasonableness with respect to the 31 signs which its evidence indicated had already been fully amortized. ■ Although essential maintenance repairs may be said to prolong to a degree the useful life of any structure, and are permitted to those that are nonconforming (*Ricciardi* v. *County of Los Angeles* (1953) 115 Cal.App.2d 569, 576 [5] [252 P.2d 773]), the repairs cannot be relied upon to defeat zoning legislation which looks to the future and the eventual liquidation of nonconforming uses. (*Livingston Rock etc. Co.* v. *County of Los Angeles, supra,* 43 Cal.2d 121, 127 [4].) ■ It may also be noted that there is no showing that if, as testified by plaintiff's witness, these signs have been repaired to such an extent that they have many years of useful life remaining, they cannot be used elsewhere. Plaintiff's assertion in its brief that the signs have value only in their particular locations and for their peculiar use is unsupported by evidence and fails to meet plaintiff's burden of proof.

■ With respect to the other 11 signs, not yet fully amortized, removal should await expiration of a reasonable amortization period in order to permit plaintiff to recover their original cost.[1]

---

[1]The fact that because of start-up and servicing costs no profit is realized by plaintiff under its contracts until the third year is not helpful. Although it would appear that any such contracts entered into before the effective date of the 1965 amendments should be permitted to run their course before removal of the involved sign is required, all of those contracts have of course expired by now. With respect to 25 contracts shown to have been entered into after the effective date of the 1965 amendments, plaintiff proceeded at its own peril insofar as any such contract covered a sign already fully amortized. Additionally, the removal costs, averaging $139 per sign, do not demonstrate that the ordinance is arbitrary or unreasonable; such costs may

The judgment is reversed with respect to the 31 fully amortized signs, but is affirmed otherwise. Each party shall bear its own costs on appeal.

Traynor, C. J., McComb, J., and Mosk, J., concurred.

**SULLIVAN, J.**—I dissent.

In my judgment the majority opinion, although avowedly relying upon decisional precedents, actually represents a radical alteration of existing California law. The resulting change would not in itself cause me concern, if I were satisfied that it was responsive to a growth of principle or that it would in all probability improve the applicable rule of law. Nevertheless, I feel that however pragmatically desirable the majority may view the result in this case, the rule which they have created in achieving it may only confuse the trial courts of this state and in the long run may prove to be far less palatable to this court.

Admittedly, the problems incident to the elimination of nonconforming uses are troublesome ones.[1] Ten years ago there was general agreement that the fundamental problem facing zoning was the inability to eliminate the nonconforming use.[2] Since their existence limits the effectiveness of land use controls, state and local legislatures have sought ways to neutralize the effect of such uses and finally to eliminate them. Among the methods available to accomplish this are: (1) condemnation through the power of eminent domain; (2) abatement through the law of nuisance; (3) forbidding resumption of a nonconforming use after a specified period of nonuse or "abandonment"; (4) prohibiting or limiting the right of the owner to repair, extend, or rebuild the nonconforming structure; (5) offering inducements either to move or to make the use comply with the ordinance's requirements.

The early optimism about the spontaneous withering away of nonconforming uses has proven erroneous; in fact, the very zoning ordinances which make uses nonconforming often invest them with a monopolistic position that enables them to survive. In the face of this, and of the fiscal impracticality of some of the alternatives listed above, planners have con-

---

not reasonably be compared with the net profit from only the latest contracts covering the signs, but instead relate to their entire productive periods.

[1] "A 'nonconforming use' within the meaning of zoning regulations has been defined as 'the use of a building or land that does not agree with the regulations of the use district in which it is situated.'" (58 Am.Jur., Zoning, § 146, p. 1021.) The nonconforming uses which have posed problems for the courts are those which antedate the enactment of the zoning ordinance that prohibits them, i.e., those which complied with all zoning laws when they were constructed.

[2] *Grant* v. *Mayor & City Council of Baltimore* (1957) 212 Md. 301 [129 A.2d 363, 365]; *City of Los Angeles* v. *Gage* (1954) 127 Cal.App.2d 442, 454 [274 P.2d 34].

cluded that "the only positive method of getting rid of nonconforming uses yet devised is to amortize the nonconforming building. That is, to determine the normal useful *remaining* life of the building and prohibit the owner from maintaining it after the expiration of *that* time." (Italics added.)[3] (Crolly and Norton, *Termination of Nonconforming Uses* (1952) 62 Zoning Bulletin 1; quoted in *City of Los Angeles* v. *Gage, supra,* 127 Cal.App.2d 442, 455.)

Some courts have taken the position that provisions for amortization of nonconforming uses are necessarily invalid, regardless of the length of time provided for the use to continue and regardless of the benefit to the public in securing uniformity within zone use districts. The most articulate and persuasive recent statement of this position coming to my attention is contained in *Hoffmann* v. *Kinealy* (Mo. 1965) 389 S.W.2d 745, where the Supreme Court of Missouri held that abatement of preexisting nonconforming uses in conjunction with an amortization period was unconstitutional. The court reasoned that since a preexisting lawful use could not properly be terminated immediately,[4] such a taking should not be permitted to be achieved "by the simple expedient of *postponing* such taking for a 'reasonable' time." (389 S.W.2d at p. 753.) The court remarked that it would be a "strange and novel doctrine indeed which would approve a municipality taking private property for public use without compensation if the property was not too valuable and the taking was not too soon, . . ." (389 S.W.2d at p. 753.)

Although an early case, *Jones* v. *City of Los Angeles* (1930) 211 Cal. 304, at p. 309 et seq. [295 P. 14], seemed to presage adoption of this position in California, subsequent cases have firmly, and I believe very wisely, committed us to the proposition that "zoning legislation looks to the future in regulating district development and the eventual liquidation of noncon-

---

[3]Stated in its simplest terms, amortization contemplates the compulsory termination of a nonconforming use at the expiration of a specified period of time, which period is equal to the useful economic life of the nonconformity. (Katarincic, *Elimination of Nonconforming Uses, Buildings and Structures by Amortization—Concept* v. *Law* (1963) 2 Dusquene L.Rev. 1.)

[4]Until the present opinion, this appeared to be the rule in California as well. See, e.g., *City of Los Altos* v. *Silvey* (1962) 206 Cal.App.2d 606, 609 [24 Cal.Rptr. 200]: "Discontinuance forthwith of a nonconforming use which is not a nuisance and which existed when the ordinance was adopted is a deprivation of property without due process of law." (See also *McCaslin* v. *City of Monterey Park* (1958) 163 Cal. App.2d 339 [329 P.2d 522]; *National Advertising Co.* v. *County of Monterey* (1962) 211 Cal.App.2d 375 [27 Cal.Rptr. 136].) The erosion of this doctrine seems to me to be one of the inevitable but undesirable consequences of the majority opinion. If a structure which has been "fully amortized" may be constitutionally required in all instances to be removed in one year, I suppose six months or one month would likewise be permissible. At least the rationale of the opinion suggests no distinction between the periods.

forming uses within a prescribed period commensurate with the investment involved."[5] (*Livingston Rock etc. Co.* v. *County of Los Angeles* (1954) 43 Cal.2d 121, 127 [272 P.2d 4].) *Livingston* and the nearly contemporaneous case of *City of Los Angeles* v. *Gage, supra,* 127 Cal.App.2d 442, which relied on it, elaborated the basic philosophical foundation for approval of compelled elimination of nonconforming uses within specified periods. "Implicit in the theory of the police power," we said in *Livingston,* "as differentiated from the power of eminent domain, is the principle that incidental injury to an individual will not prevent its operation, once it is shown to be exercised for proper purposes of public health, safety, morals and general welfare, and there is no arbitrary and unreasonable application in the particular case. [Citations.]" (43 Cal.2d at p. 127.) And in *Gage,* the court pointed out, in an often quoted passage, the arbitrariness inherent in the distinction between the permissible impact on land values of "prospective" zoning ordinances and the impermissible infringement upon "vested rights" of attempts to eliminate nonconforming uses. The court there said, "The distinction between an ordinance restricting future uses and one requiring the termination of present uses within a reasonable period of time is merely one of degree, and constitutionality depends on the relative importance to be given to the public gain and to the private loss. . . . The elimination of existing uses within a reasonable time does not amount to a taking of property. . . . Use of a reasonable amortization scheme provides an equitable means of reconciliation of the conflicting interests in satisfaction of due process requirements." (*City of Los Angeles* v. *Gage, supra,* 127 Cal.App.2d 442, at p. 460.)

Since these seminal decisions over 15 years ago this court has not addressed itself to the validity of provisions for the removal of nonconforming uses within specified amortization periods. The Courts of Appeal have wrestled with the difficult considerations implicitly required to be dealt with by our directive to uphold amortization periods if, but only if, they are "reasonable." Illustrative of the varying results and the diverse formulations

---

[5]The adoption of this position was foreshadowed by the language in *County of San Diego* v. *McClurken* (1951) 37 Cal.2d 683 [234 P.2d 972], which was relied on by the court in *Livingston* as authority for the quotation in the text, *supra. McClurken* involved the application of a statute forbidding enlargement of an existing nonconforming use. We there said: "Such a provision [one exempting existing uses but forbidding their enlargement or reconstruction] is ordinarily included in zoning ordinances because of the hardship and doubtful constitutionality of compelling the immediate discontinuance of nonconforming uses. [Citation.] 'The object of such a provision is the gradual elimination of the nonconforming use by obsolescence or destruction by fire or the elements, and it has been frequently upheld by the courts.' [Citation.] There is a growing tendency to guard against the indefinite continuance of nonconforming uses by providing for their liquidation within a prescribed period. [Citation.]" (37 Cal.2d at p. 686.)

of the applicable standards are: *City of La Mesa* v. *Tweed & Gambrell Planing Mill* (1956) 146 Cal.App.2d 762 [304 P.2d 803] (holding invalid as a taking of property without compensation a five-year tolerance period as applied to a 20-year-old building with an estimated remaining economic life of 20 years); *McCaslin* v. *City of Monterey Park, supra,* 163 Cal.App.2d 339 (holding invalid a 60-day amortization period as applied to a gravel pit operation); *City of Santa Barbara* v. *Modern Neon Sign Co.* (1961) 189 Cal.App.2d 188 [11 Cal.Rptr. 57] (holding invalid as a taking of property without due process and/or without just compensation a one-year period as applied to recently installed moving advertising signs); *National Advertising Co.* v. *County of Monterey, supra,* 211 Cal.App.2d 375 (holding a five-year period valid as applied to advertising signs of the type involved in the instant case.)

As I have already indicated, analyses of the constitutional problems presented in these cases are not precisely uniform. The results of the cases probably satisfy neither the desire of local planners for autarchy nor the demands of some economists for rigorous social cost analysis. However, as accommodations of the clash between governmental initiative for the public welfare on the one hand and private security in the ownership of property on the other, they have been as satisfactory as can be expected. But this freedom of trial and intermediate appellate courts, thus far intelligently exercised, to decide the questions of reasonableness through a process of balancing public benefit against private detriment will no longer exist under the rationale of the majority opinion. The majority upset the judgment of the trial court which applied the heretofore approved balancing test. They substitute, however, not a conclusion that the trial court's decision was arbitrary in light of the facts of this case, but a litmus paper test for reasonableness: the concept of depreciation, fashioned solely from guideline materials developed for income tax purposes by the United States Internal Revenue Service.

Briefly, and I hope fairly restated, the reasoning of the majority proceeds as follows: Under the amortization regulations of the Internal Revenue Service, 31 of plaintiff's 42 advertising signs have been "fully amortized."[6] The trial court found that these signs were kept in good repair and accordingly, had many years of useful life remaining. This, however, say the majority, is irrelevant since "repairs cannot be relied upon to defeat zoning legislation which looks to the future and the eventual liquidation of non-

---

[6]General accounting usage normally refers to the write-off of tangible assets used in a trade or business as "depreciation" rather than "amortization," which applies to intangibles. (Michie, Federal Tax Handbook (1968) at p. 383.)

conforming uses."[7] In addition, these signs may have some value even after they are removed from their present locations. Therefore, so the majority conclude, the requirement that they be dismantled and removed within one year is reasonable.

I am not persuaded that the majority have grounded their opinion upon a simple failure by plaintiff to meet its burden of proof in demonstrating that the grace period of the ordinance is, as applied to its billboards, so short as to be unreasonable. Were this the case, although I would still consider the disposition erroneous,[8] I would be less apprehensive about the future development of this area of the law. However, it seems plain to me that the implicit rationale of the majority opinion is that recovery of investment is the controlling factor in determining the reasonableness of an amortization provision. If the reason for reversal of the trial court's judgment as to the *amortized* signs is in fact that plaintiff fell short of demonstrating unreasonableness (principally because it neglected to provide evidence of "present actual value" of the signs) I do not understand how

---

[7] I cannot agree with the casual dismissal of plaintiff's repairs in connection with its structures, nor do I think it warranted by the cases to which the majority refer. *Livingston* did not involve and does not mention repairs. And in *People* v. *Ricciardi* (1943) 23 Cal.2d 390 [144 P.2d 799], the repairs were to a structure which was a nonconforming use. Here, however, the billboards in issue did not become nonconforming until 1965. It is obvious that most repairs took place before that date and, hence, were to *conforming* structures.

It also appears that these repairs may have been in part the bases for the "book value" which is accorded no weight by the majority. It is a reasonable inference from the testimony of the plaintiff's witness that the Internal Revenue Service refused to permit p'aintiff to treat all such repairs as annual expenses and thus deduct them under 26 U.S.C.A. section 162. Instead, some portion was required to be treated as a capital expenditure and this value added to the signs' "basis." This would account for a book value even in signs which had been fully depreciated.

[8] In my view there is sufficient evidence in the record from which the trial court could have concluded that the value of the signs (while not identified precisely) was too substantial, in light of the purely esthetic benefit to the public, to permit removal in a period as short as one year. I cannot concur with the statement of the majority that the plaintiff "produced no evidence with respect to present actual value of any of the signs, . . ." (*Ante,* p. 880.) While plaintiff did not, as would have been preferable, produce expert appraisal testimony as to the present value of the signs, it did introduce substantial data concerning the revenue schedules for the existing contracts on each board and an analysis of the corresponding expenses. An examination of these documents reveals that 39 signs (three are donated by plaintiff to use for public service messages and, hence, create no income) produce approximately $23,700 gross income annually under contracts existing at the date of trial. The approximate net income for these signs is $3,630 annually. Most contracts are for a term of three years. Even assuming, therefore (and there is no practical reason to so assume) that none would be renewed at the expiration of their terms, the present value of the income stream for the three-year contract period is approximately $10,155, assuming a discount rate of 8 percent per year. And the trial court's finding is undisputed that, due to extensive repairs, the signs had many years. of useful life remaining.

this justifies affirmance of the judgment as to the *unamortized* signs. As the majority point out, the evidence as to both classes of signs was identical.

Rather than infer that the majority have reached a result inconsistent with their rationale, I am compelled to conclude that the different dispositions as to amortized and unamortized signs reflect a considered judgment that once initial investment is recovered through deductions from business income under 26 U.S.C.A., section 167, any amortization period, however, brief, is reasonable.

I do not think that this is logically persuasive, economically sound or likely to produce fairer or more satisfying decisions by the courts below in future cases involving the removal of nonconforming uses. It seems to me that instead of providing a predictable and uniform standard by which to determine the reasonableness of zoning ordinances, the majority have established a mechanical and illusory criterion.

Under our decision in *Livingston, supra,* 43 Cal.2d 121, we indicated that the focus of judicial inquiry is on the "reasonableness" of a particular amortization period as applied to a particular piece of property or its use. What this entails, really, is a judgment whether, in light of the public ends to be served by removal, this quantum of private loss is an acceptable one. To put it somewhat differently, our holding in *Livingston* requires the determination as to whether or not the nonconforming interest affected by a given ordinance is too substantial to justify its removal in a stipulated period of time having in mind the objectives of the ordinance.

This analysis demands, at the very least, an accurate measure of the private loss.[9] In some cases this may be accomplished by determining the difference between the fair market value of the property on the effective date of the ordinance and its fair market value when the nonconformity is eliminated.[10] In others, the loss to the property owner may be affected by such factors as "the expense and practicality of a relocation, the loss of good will occasioned by a relocation, the economy of converting the physical facilities into a conforming use, and the financial benefits derived by the land owner from operation under the monopoly given him by the

---

[9]This side of the equation is capable of much more precise identification than is the "public interest" to be served. It is often difficult to be certain who are the primary and intended beneficiaries of governmental action. Courts can make only very rough approximations of relative priorities to be attached to local problems.

[10]In this we analogize to the valuation procedure followed in the law of eminent domain. There the general rule is that when private property is taken for public use the compensation is measured by the fair market value of the property taken. (*Rose* v. *State of California* (1942) 19 Cal.2d 713 [123 P.2d 505].) The compensation for any damage resulting to the landowner is measured by the diminution in value of the property. (*Rose, id.,* at p. 737; *People* v. *Ricciardi, supra,* 23 Cal.2d 390, 401.)

zoning ordinance." (See Note, *The Abatement of Pre-existing Noncon-forming Uses Under Zoning Laws: Amortization* (1962) 57 Nw.U.L.Rev. 323, 332.)

Certainly, recovery of an owner's original investment is one factor to be considered in the balancing of public benefits and private losses. But it is simply inaccurate to assume that depreciation guidelines necessarily reflect parallel devaluations in the physical world. That a taxpayer's adjusted basis in property is zero hardly means that such property is in fact without market value. To focus solely on depreciation is to ignore the loss involved and the realistic ways of measuring it.

The balancing of these disparate elements of property value against the often uncertainly articulated public values of zoning policy which we required in *Livingston* is indeed a difficult task. Obviously the approach adopted by the majority to such problems is at once facile and convenient since it eliminates any necessity for involved factual inquiries. Like the older vested rights theory which condemned *any* legislation requiring the eventual elimination of lawful nonconforming uses, it in effect establishes the useful device of a conclusive presumption. The vested rights theory holds that when a use is in existence prior to a zoning change, the loss to the owner is conclusively presumed to outweigh the benefit to the com-munity.[11] The majority opinion, on the other hand, appears to me to propose that when an owner has "fully amortized"[12] his initial investment in a structure, the presumption which should be indulged in is that either: (1) immediate removal entails no loss or (2) whatever loss is suffered is outweighed by the benefit to the community.

Unfortunately, these presumptions are not always going to be valid. Nor will the results they produce be accepted with as much equanimity when the "fully amortized" structure to which they are applied is not an intrusive billboard but is an elegant though elderly apartment house.

In sum, I think that the majority have abandoned the principles an-nounced by this Court in *Livingston* and developed and applied by a number of Courts of Appeal opinions. In their place is a single mechanical rule devised by a federal taxing agency to govern procedures in an un-

[11]Note, *supra,* 57 Nw.U.L.Rev. 323, at p. 332.

[12]The opinion apparently makes no provision for either nondepreciable property (land; property not used in a trade or business or for the production of income) or for nonconforming *uses*—which are themselves not capable of amortization or depreciation in the conventional accounting sense of the term as employed by the majority. See, e.g., the treatment of the nonconforming uses in *Gage, supra,* 127 Cal.App.2d 442, and, for a noticeably inept attempt to apply amortization theory to the concept of a use, see *Harbison* v. *City of Buffalo* (1958) 4 N.Y.2d 553, 562 [176 N.Y.S.2d 598, 152 N.E.2d 42, 47].

related area of governmental activity. In order to arrive at this novel doctrine, the majority have ignored evidence in the record from which the trial court could have found that the signs possessed, at the minimum, a present value in excess of $10,000. (See, *ante,* fn. 8.) In light of the public benefit involved, I believe that the trial court could properly have concluded that a loss of this magnitude is too substantial reasonably to be borne in a period of only one year.

I think that the trial court properly applied existing California law and that its determinations of fact are supported by substantial evidence in the record. Finding no error in the record, I would affirm the judgment.

Peters, J., and Tobriner, J., concurred.