[No. A012721. First Dist., Div. Three. Feb. 13, 1987.]

CITY OF SALINAS, Plaintiff, Cross-defendant and Respondent, v.
RYAN OUTDOOR ADVERTISING, INC., Defendant, Cross-complainant
and Appellant.

418

Counsel

Price, Postel & Parma and Gary R. Ricks for Defendant, Cross-complainant and Appellant.

David M. Kennedy, City Attorney, for Plaintiff, Cross-defendant and Respondent.

OPINION

WHITE, J.—

*Introduction:*

The instant appeal is before us on remand from the United States Supreme Court for further consideration in light of *Metromedia, Inc.* v. *City of San Diego* (1981) 453 U.S. 490 [69 L.Ed.2d 800, 101 S.Ct. 2882]. That case was a review of the California Supreme Court's opinion in *Metromedia, Inc.* v. *City of San Diego* (1980) 26 Cal.3d 848 [164 Cal.Rptr. 510, 610 P.2d 407]. The state Supreme Court has since published its opinion in *Metromedia, Inc.* v. *City of San Diego* (1982) 32 Cal.3d 180 [185 Cal.Rptr. 260, 649 P.2d 902]. For convenience these cases will be designated *Metromedia (Cal.) I, Metromedia, U.S.,* and *Metromedia (Cal.) II* respectively, in this opinion.

Ryan Outdoor Advertising, Inc. (hereafter Ryan or appellant), a Texas corporation, engaged in the outdoor sign advertising business in the City of Salinas (hereafter City or respondent) appeals a judgment enjoining its maintenance and ordering removal forthwith of "all of its offsite advertising signs and structures present at those locations specified in Exhibit A of the Complaint on file herein."

The City sought a mandatory injunction to compel Ryan to comply with the City's Ordinance No. 1103 (N.C.S.), a comprehensive land use zoning ordinance based on the general plan for the City and enacted in order to promote the public health, safety, morals, comfort and general welfare of its citizens.[1] The trial court also found, and Ryan does not dispute, that the

[1]Salinas Ordinance No. 1103 (N.C.S.) was adopted March 5, 1962, and became effective April 5, 1962, and although amended since, its basic provisions have remained in effect.

Ordinance No. 1103 (N.C.S.) permits offsite signs and billboards only in the general commercial (CG) zoning districts and, upon obtaining a use permit therefor, in the unclassified (U) zoning districts; offsite signs and billboards located in other zoning districts are declared to be nonconforming uses and public nuisances, and their removal is required within five years of the effective date of the ordinance.

Ordinance No. 1488 (N.C.S.), adopted on August 16, 1971, amended Ordinance No. 1103 (N.C.S.) and defined the term "offsite" sign to mean a sign whose sponsor does not maintain offices and/or provide services at the site of the sign; Ordinance No. 1488 (N.C.S.) reaffirmed the basic provisions of Ordinance No. 1103 (N.C.S.) and continued the prohibition against offsite signs in the zone districts in which Ryan signs, as shown in Exhibit A of the complaint,

promotion of traffic safety and the enhancement of community aesthetic values were among the reasons which prompted the adoption of the ordinance. Ryan maintained offsite outdoor advertising signs at 44 locations throughout the City. The structures, which require a capital investment of $3,500 to $5,000, are placed on land leased from private owners for periods of 10 to 15 years. Nineteen of appellant's structures were nonconforming at the time of trial because they were not in general commercial districts and are the subject of this action. Nine are in the "Santa Rita" area, annexed by the City in 1974, and became nonconforming in 1979 when the five-year amortization period had run. The remaining 16 structures are within general commercial districts, but they exceed the 22-foot height limit. These structures were not, however, a subject of the City's complaint filed in 1974.

The City's Ordinance No. 1103 (N.C.S.) permits offsite signs only in general commercial zoning districts, and, with a permit, in the unclassified zones, and all offsite signs and billboards in other zones are declared nonconforming uses and public nuisances, and their removal is required within five years.[2] Ordinance No. 1103 (N.C.S.) does not provide compensation for

---

are located, and continued the five-year amortization period with the further provision that all nonconforming signs then already fully amortized should be removed forthwith and should not receive the benefit of a new amortization period.

Additional sign regulations of the City prescribe that no sign may be located within 500 feet of the outer limits of the right-of-way of any freeway, except signs authorized by federal, state, county or city law (Ord. Nos. 1020 (N.C.S.) and 1068 (N.C.S.)); and no offsite sign may exceed 22 feet in height (Ord. No. 1488 (N.C.S.)).

The regulations were further amended in December 1981 by Ordinance No. 1838 (N.C.S.), a certified copy of which was accepted as additional evidence on appeal by order of this court dated January 26, 1982.

Ordinance No. 1838 (N.C.S.) defines an "onsite" sign as one used exclusively: "(1) To advertise the sale or lease of the property upon which such sign is located;

"(2) To designate the name of the owner or occupant of the premises or to identify such premises without regard to whether the character of the use is commercial or noncommercial.

"(3) To advertise the business conducted or services rendered or the goods produced or sold upon the property upon which such sign is located if the sign is on the same side of any public street or highway and within eight hundred feet of the point on the property or within eight hundred feet of the entrance to the site at which the business is conducted or services are rendered or goods are produced or sold.

"(4) To present a noncommercial message in accordance with section 37-236.39."

Section 37-236.39 reads as follows: "Notwithstanding any other provisions of this Article, any sign sponsor may allocate a sign area authorized by this Article to a noncommercial message."

Further, the ordinance expresses the finding of the city council that "this ordinance is merely declaratory of existing law and practice within the City."

[2]The trial court's findings of fact, 11 through 15, are as follows: "11. The sign shown in Exhibit A of the Complaint as located at Sanborn Road South and Pellet, Assessor's Parcel No. 3-561-13, was removed by Ryan prior to trial of this action.

"12. The population of Salinas is now 74,000 and in 1962 was 40,000.

"13. The City contains approximately 9,237 acres of land and is divided into the following zoning districts (containing the following number of acres and percentages of land):

removal of any outdoor advertising sign, or any other structure maintained in violation of its provisions. Although Ryan purchased the sign structures at issue in 1965, at least three years after they had been declared nonconforming, appellant cross-complained, seeking a judgment that the ordinance was unconstitutional on its face and as applied to its property, and an injunction restraining the enforcement of the ordinance. Alternatively, Ryan sought damages for the total abolition of its outdoor advertising business in the City.

The trial court concluded that Ordinance No. 1103 (N.C.S.) is a valid exercise of the police power in promoting traffic safety and enhancing community aesthetic values; that Ryan's signs at issue are public nuisances as a matter of law; that the ordinance's five-year amortization period is a reasonable exercise of the police power, and therefore appellant is not entitled to compensation for any damages sustained from removing its offsite advertising signs.

I

The trial court's decision was filed July 11, 1977. Subsequently the California Supreme Court published its opinion in *Metromedia (Cal.) I, supra,*

| ACRES | | ZONE | PERCENTAGE |
|---|---|---|---|
| 964 | 'U' | Unclassified | 10% |
| 944 | 'A' | Agriculture | 10% |
| 900 | 'C' | Commercial (other than CG) | 10% |
| 274 | 'CG' | General Commercial | 3% |
| 1077 | 'M' | Manufacturing | 19% |
| 4380 | 'R' | Residential | 47.4% |

The General Commercial (CG) zoning districts comprise 3% of the City's total area, and 6% of the City's non-residential area.

"14. The U. S. 101 Freeway runs through the heart of the City of Salinas for approximately 6 miles; substantial areas of General Commercial (CG) and Unclassified (U) zoning districts border the freeway. (Plaintiff's Exhibit 6)

"15. General Commercial (CG) zoning districts are located substantially near the core of the City and border the following major streets in the City (which are heavily traveled): (Plaintiff's Exhibit 6).

| STREET NAME | APPROXIMATE LENGTH (COMBINING BOTH SIDES OF STREET) |
|---|---|
| Market Street | 2 miles |
| Abbott Street | 2¾ miles |
| East Alisal Street | ¾ mile |
| North Main Street | ¼ mile |
| John Street | ¼ mile" |

Both parties have recently submitted letter briefs at the request of this court discussing the issues in the instant case in light of *Metromedia U.S.* and *Metromedia (Cal.) I & II.* Neither party alleged changes in the facts. We proceed in this opinion on the assumption that the material facts are unchanged and the trial court's findings still valid.

26 Cal.3d 848 (*Metromedia* (*Cal.*) *I*), discussing virtually the same issues involved in the instant case, and our original opinion filed December 2, 1980, followed that case. We concluded that the City's ordinance regulating the placement and size of billboards was a valid exercise of its police power, and that the amortization period was reasonable. We also held that, under *Metromedia* (*Cal.*) *I*, the City's ordinance banning permanent structures used predominantly for commercial purposes did not violate the First Amendment. We also concluded that *Metromedia* (*Cal.*) *I* controlled the issue of compensation due to Ryan for the removal of certain signs, and held in accordance with *Metromedia* (*Cal.*) *I* that the City's Ordinance No. 1103 (N.C.S.) as amended in Ordinance Nos. 1488 (N.C.S.), 1020 (N.C.S.) and 1068 (N.C.S.), was partially preempted by the Outdoor Advertising Act (Bus. & Prof. Code, § 5200 et seq.).

When the United States Supreme Court considered the issues raised by the *Metromedia* case, the plurality opinion held that the ordinance at issue was facially unconstitutional insofar as it constituted a general ban on noncommercial advertising on outdoor signs, but that its restrictions on commercial signs were constitutional. (*Metromedia, Inc.* v. *San Diego, supra,* 453 U.S. at p. 513 [69 L.Ed.2d at p. 818].) It did not discuss or criticize the California Supreme Court's resolution of the other questions raised. We therefore conclude that the reasoning of the court in *Metromedia* (*Cal.*) *I* and its statement of the law on other issues is still correct, and we have again relied on it in the following discussion of issues raised in the instant case, apart from the First Amendment challenge.

## II

Appellant Ryan nominally challenged City's ordinance as exceeding the permissible limits of its police power, and as an unconstitutional "taking" without just compensation, in violation of the Fifth Amendment.

The U.S. Supreme Court has made it clear that local regulations imposing restrictions on outdoor commercial advertising are a constitutionally valid means of advancing the substantial governmental interests of traffic safety and the appearance of the city. (*Metromedia, U.S., supra,* 453 U.S. at pp. 508-510 [69 L.Ed.2d at pp. 815-817].)

The appellant argues that requiring removal of its signs in the restricted areas is a "taking" requiring compensation under the U.S. Constitution. However, it is settled law that local zoning legislation may require termination of nonconforming uses if it provides for a reasonable amortization period, considering the investment involved. (*National Advertising Co.* v. *County of Monterey* (1970) 1 Cal.3d 875, 878 [83 Cal.Rptr.

577, 464 P.2d 33] [app. dism. 398 U.S. 446 [26 L.Ed.2d 286, 90 S.Ct. 1869]]; *Livingston Rock etc. Co.* v. *County of L.A.* (1954) 43 Cal.2d 121, 127 [272 P.2d 4]; *City of Los Angeles* v. *Gage* (1954) 127 Cal.App.2d 442, 454-460 [274 P.2d 34].)

The reasonableness of the amortization period depends on the interplay of many factors, including the depreciated value of the structures to be removed, their remaining useful life, and the harm to the public if they are left standing. (See *Hadacheck* v. *Los Angeles* (1915) 239 U.S. 394 [60 L.Ed. 348, 36 S.Ct. 143]; *National Advertising Co.* v. *County of Monterey, supra,* 1 Cal.3d at p. 886 (dis. opn. of Sullivan, J.); *City of La Mesa* v. *Tweed & Gambrell Mill* (1956) 146 Cal.App.2d 762, 770 [304 P.2d 803]; *City of Los Angeles* v. *Gage, supra,* 127 Cal.App.2d at p. 461; *Art Neon Co.* v. *City and County of Denver* (10th Cir. 1973) 488 F.2d 118, 121 [cert. den. 417 U.S. 932 (41 L.Ed.2d 236, 94 S.Ct. 2644)].)

█ Ordinance No. 1103 (N.C.S.), enacted in 1962, provided a five-year amortization period. The 1971 Ordinance No. 1488 (N.C.S.) reaffirmed the basic provisions of Ordinance No. 1103 (N.C.S.), added a 22-foot height limitation for all signs and billboards within the general commercial zone, and continued the five-year amortization period, but with the qualification that all nonconforming signs already amortized should be removed without a further amortization period. Thus, by the time of the proceedings in the trial court, appellant had had 15 years to recoup its investment in the 19 structures ordered removed.

The burden was on appellant to establish the unreasonableness of the amortization period with regard to each structure declared nonconforming. (See *National Advertising Co.* v. *County of Monterey, supra,* 1 Cal.3d at p. 879; *Art Neon Co.* v. *City & County of Denver, supra,* 488 F.2d at p. 121.) At trial, appellant made no attempt to meet this burden. It limited its argument to the claim that all the affected signs and billboards still produced income and were valuable, and that the removal of them would be expensive and would generally hurt the business. However, as a court in a different jurisdiction observed in a comparable context: "It is not required that the nonconforming property concerned have no value at the termination date." (*Art Neon Co.* v. *City & County of Denver, supra,* 488 F.2d at p. 121.)

The trial court found that Ryan's investment in the signs and billboards in question had been recouped, and that therefore the ordinance's amortization period as applied to it was reasonable. We agree, subject to the considerations discussed *post* relating to removal of structures near federal highways.

## III

The California Outdoor Advertising Act (Bus. & Prof. Code, § 5200 et seq.) contains provisions for compensation for the removal of certain billboards as required by the federal Highway Beautification Act (23 U.S.C. § 131; *Metromedia (Cal.) I, supra,* 26 Cal.3d at p. 873).

The federal statute provides for a 10 percent cut in federal funds for state highways if a state fails to provide for "effective control" of outdoor advertising signs, displays and devices which are: (1) "within six hundred and sixty feet of the nearest edge of the right-of-way and visible from the main traveled way [of] the Interstate System and the primary system [of federal highways]," and (2) "more than six hundred and sixty feet off the nearest edge of the right-of-way, located outside of urban areas, visible from the main traveled way of the system, and erected with the purpose of their message being read from such main traveled way." (23 U.S.C. § 131(b).)

"Effective control," as defined in the federal statute, means essentially that the state must restrict signs in these locations to directional and official signs and notices; advertisements of sale or lease of the property on which the signs are located, or of activities on that property; landmark signs; and advertisements for free coffee distributed by nonprofit organizations. (23 U.S.C. § 131(c).)

At the first oral argument in the instant case, this court requested the parties to identify which of Ryan's outdoor advertising signs in the City were covered by the federal Highway Beautification Act. Ultimately, it was agreed that the sign located at the southeast corner of John and Work Streets (designated as sign A-15) was covered. The parties disagreed about the sign at the U.S. 101 East line, south of 1511 Abbott Street (A-16).

The City argued that the A-16 sign was exempt from the provisions of federal law, since the copy of the sign was not visible from the freeway because of the angle at which it was placed. We agree with the City that the A-16 sign was exempt from the provisions of federal law, since the copy of the sign was not visible from the "main traveled way" because of the angle at which it was placed; although the structure is visible from the highway. As quoted above the federal Highway Beautification Act was directed at state control of signs at certain distances from an interstate highway "visible from the main traveled way of the system, and *erected with the purpose of their message being read from such main traveled way, . . .*" (23 U.S.C. § 131(b), italics added; Bus. & Prof. Code, § 5412.1, subd. (c).)

As regards sign A-15, Ryan purchased the sign in 1965 at which time the sign had been a nonconforming use for three years under Ordinance No.

1103 (eff. Apr. 5, 1962). Under said ordinance A-15 was to be removed within five years of the effective date of the ordinance. The federal Highway Beautification Act of 1965 (23 U.S.C. § 131) only provides for compensation for signs lawfully in existence at the time the act became effective. (Former subdivision (g)(1) of the act.) In order to be in conformance with federal law California adopted the Outdoor Advertising Act. (Bus. & Prof. Code, § 5200 et seq.) Former Business and Professions Code section 5412, states each removal of certain advertising displays shall be regarded as a taking under the Highway Beautification Act of 1965, as in effect October 22, 1965, requiring just compensation. Under section 5412 a taking was defined as an order removing "Advertisting displays lawfully in existence on October 22, 1965." (Stats. 1970, ch. 991, p. 1776, § 2.) It is questionable that sign A-15 was lawfully in existence in 1965 since it was a nonconforming use in 1962. Subsection (g) of the Highway Beautification Act was amended in 1978 which required compensation upon removal of any billboard "not permitted under subsection (c)." A-15 does not fall within the exempt signs listed in subsection (c). Subsection (g) as amended makes no reference to signs lawfully in existence at the time the act became effective.

In *Metromedia (Cal.) I* the City argued that under the wording of subsection (g) prior to the 1978 amendments, compensation was not required for removal of any sign which constituted a nonconforming use under local zoning. In *Metromedia (Cal.) I* the court stated the "Federal Highway Administration, however, takes the position that the 1978 amendments apply to require compensation for 'signs still in existence on November 6, 1978, and those additional signs which were removed prior to November 6, 1978, but were the subject of litigation pending on that date.' [Citation.] Since the Federal Highway Administration is the agency charged with the enforcement of the Highway Beautification Act, its interpretation of the act merits great weight. [Citations.] Mindful of that interpretation and of the risk that this state might lose substantial funds if we were to adopt a construction contrary to that of the federal administration, we conclude that the amended act applies to billboards in existence or removed subject to litigation as of November 6, the effective date of the amendments." (*Metromedia, (Cal.) I, supra,* 26 Cal.3d 848, 878 .)

We therefore hold that judgment is incorrect in so much as it orders the removal of sign A-15 without just compensation and hold that Ryan is entitled to just compensation for its removal.

IV

In *Metromedia, U.S., supra,* 453 U.S. 490 , a plurality of the United States Supreme Court held a municipal ordinance regulating outdoor advertising

display signs to be unconstitutional. There, the ordinance generally prohibited outdoor display advertising with two kinds of exceptions (*id.,* at pp. 493-494 [69 L.Ed.2d at pp. 805-807]): onsite signs and signs falling within 12 specified categories ranging from bus stops and historical plaques to "[t]emporary political campaign signs." (*Id.,* at pp. 494-495 [69 L.Ed.2d at p. 807].) The plurality considered the effect of the ordinance on "commercial" and "noncommercial" speech separately. (*Id.,* at p. 505 [69 L.Ed.2d at p. 813].)

First, it invoked the standard of review for restrictions on commercial speech set out in *Central Hudson Gas & Elec.* v. *Public Serv. Comm'n* (1980) 447 U.S. 557 [65 L.Ed.2d 341, 100 S.Ct. 2343]. "(1) The First Amendment protects commercial speech only if that speech concerns lawful activity and is not misleading. A restriction on otherwise protected commercial speech is valid only if it (2) seeks to implement a substantial governmental interest, (3) directly advances that interest, and (4) reaches no further than necessary to accomplish the given objective. [Citation.]" (*Metromedia, U.S., supra,* 453 U.S. at p. 507 [69 L.Ed.2d at p. 815].)

The only factor raising an issue in *Metromedia, U.S.* was the third, i.e., whether the San Diego ordinance directly advanced the governmental interest in traffic safety and aesthetics. (*Id.,* at p. 508 [69 L.Ed.2d at p. 815].) The court concluded that there was a sufficiently rational basis to justify the City's prohibition of offsite commercial advertising (*id.,* at pp. 509-512 [69 L.Ed.2d at pp. 815-818]), and that therefore ". . . offsite commercial billboards may be prohibited while onsite commercial billboards are permitted." (*Id.,* at p. 512 [69 L.Ed.2d at p. 818].)

In the context of noncommercial speech, a different analysis was required, since the law has "consistently accorded noncommercial speech a greater degree of protection than commercial speech." (*Id.,* at p. 513 [69 L.Ed.2d at p. 818].) Yet the San Diego ordinance inverted this rule, since onsite signs were allowed only for commercial messages. The court reasoned that, "[i]nsofar as the city tolerates billboards at all, it cannot choose to limit their content to commercial messages. . . ." (*Id.,* at p. 513 [69 L.Ed.2d at p. 818].) Thus, noncommercial messages would have to be allowed wherever onsite commercial messages would be allowed.

Further, the court noted that among the enumerated exceptions to San Diego's general prohibition on outdoor advertising signs were certain noncommercial messages, e.g., religious symbols, historical plaques, and temporary political campaign signs. (*Id.,* at p. 514 [69 L.Ed.2d at p. 819].) Thus, the ordinance favored certain categories of noncommercial speech over others. The plurality opinion reasoned that, "[w]ith respect to noncom-

mercial speech, the city may not choose the appropriate subjects for public discourse .... [Thus, b]ecause some noncommercial messages may be conveyed on billboards throughout the commercial and industrial zones, San Diego must similarly allow billboards conveying other noncommercial messages throughout those zones." (*Id.,* at p. 515, fn. omitted [69 L.Ed.2d at p. 819].)

Subsequently, in *Metromedia, Inc. (Cal.) II, supra,* 32 Cal.3d 180 , the state Supreme Court found that constructing the ordinance to avoid any prohibition on noncommercial signs would not be "a fair and reasonable interpretation, but would instead constitute a judicial amendment of the ordinance," and declined to do so. (*Id.,* at p. 187.) The court reasoned that the San Diego City Council had *intended* to include some noncommercial billboards in its general prohibition, but that the *Metromedia, U.S.* case had made it clear that prohibiting noncommercial signs in areas while allowing commercial signs in these areas was unconstitutional. (*Id.,* at p. 189.) Reluctant to construe a law contrary to legislative intent, and finding that severance presented practical and substantive difficulties, the court held the San Diego ordinance to be invalid. (*Id.,* at p. 191.)

Significantly, the *Metromedia (Cal.) II* court observed that ". . . an alternative ordinance which regulated the location, size, and appearance of billboards but stopped short of a total ban could severely limit the total number of billboards within the city, eliminate those signs which posed the greatest traffic hazard or aesthetic blight, and prevent the erection of new signs in undesirable locations. . . . [S]uch an alternative ordinance might avoid the problem of distinguishing commercial from noncommercial speech. In short, given the invalidity of a ban on all off-site billboards, the legislative purpose may be better served by an ordinance which bans most off-site billboards than by one which draws a distinction based on the content of the billboard's message." (*Id.,* at p. 191.)

## V

Ryan makes numerous attacks on the ordinances that regulate the placement of signs and particularly Ordinance No. 1838 which concerns onsite signs. The City's onsite regulations only addressed commercial messages at the time *Metromedia, U.S.* was decided. In order to be in compliance with the law set forth in *Metromedia, U.S.,* the City adopted Ordinance No. 1838. This ordinance did not affect the other onsite sign regulations which limited the number of onsite signs that could be placed on properties in each zoning district.

Ryan contends that Ordinance No. 1838 favors commercial speech over noncommercial speech. He argues that if a property owner is limited

to one sign on his property, he will naturally use it for commercial purposes. Ordinance No. 1838 allows the owner of the property to choose the type of sign he wishes to place on his property. Even if Ordinance No. 1838 will result in more commercial signs than noncommercial signs, it is not unconstitutional. "The fact that the city may value commercial messages relating to onsite goods and services more than it values commercial communications relating to offsite goods and services does not justify prohibiting an occupant from displaying its own ideas or those of others." (*Metromedia, U.S., supra,* 453 U.S. 490, 513 [69 L.Ed.2d 800, 818].) Ordinance No. 1838, by allowing noncommercial messages by an occupant or another person (who has the permission of the occupant), meets the constitutional requirement quoted above.

## VI

■ Next Ryan contends allowing a person other than the owner of the premises to place a noncommercial sign on a property under Ordinance No. 1838, undermines whatever interest the City may profess to have in traffic safety and/or aesthetics. This argument simply overlooks the fact that other regulations control the number of signs on a property in each zoning district. The City does not regulate under Ordinance No. 1838 the contents of signs, but through other regulations restricts the number and place of such signs. Thus the regulatory scheme adopted by the City including Ordinance No. 1838 is still justified by the exercise of the police power in promoting traffic safety and enhancing community aesthetic values. Such a regulatory scheme is not unconstitutional. (*Metromedia, U.S., supra,* 453 U.S. at p. 516 [69 L.Ed.2d at p. 820].)

## VII

■ Ryan at oral argument after remand of this case by the United States Supreme Court argued that Ordinance No. 1838 is invalid because it does not define what is commercial speech and what is noncommercial speech. Ryan argued that this distinction should not be made by some City official. The contention was addressed and rejected in *Major Media of the Southeast v. City of Raleigh* (4th Cir. 1986) 792 F.2d 1269, 1272-1273, wherein the court stated: "Although the ordinance provides no definition of 'commercial' or 'non-commercial' speech, sufficient guidance is given for such determination by City officials by the various decisions of the Court relating to billboards and commercial speech. We agree with the district court that 'no codification of these terms is necessary, since the Supreme Court has already defined them.' See *Central Hudson Gas & Elec.* v. *Public Service Comm'n,* 447 U.S. 557, 561, 100 S.Ct. 2343, 2348, 65 L.Ed.2d 341 (1980). In *Central Hudson Gas,* the Court stated that commercial speech was 'expression related

solely to the economic interests of the speaker and its audience.' Although an occasional marginal case might arise raising the question of whether on the particular facts the definition of commercial speech would be correct, such an infrequent possibility should not in itself justify a generalized charge that the ordinance itself is vague, given the guidance afforded by court decisions in the area."

## VIII

█ Ryan also argues that Ordinance No. 1838 is discriminatory because it favors property owners and allows them to regulate onsite signs, while nonproperty owners have no such rights. Even if Ordinance No. 1838 favors property owners, the ordinance is not unconstitutional. In regard to commercial speech it is clear that property owners or lessees of same, may receive preferential treatment without violating the United States Constitution. "As we see it, the city could reasonably conclude that a commercial enterprise —as well as the interested public—has a stronger interest in identifying its place of business and advertising the products or services available there than it has in using or leasing its available space for the purpose of advertising commercial enterprises located elsewhere. See *Railway Express, supra,* at 116 (Jackson, J., concurring); *Bradley* v. *Public Utilities Comm'n,* 289 U.S. 92, 97, 77 L.Ed. 1053, 535 S.Ct. 577, 85 A.L.R. 113] (1933). It does not follow from the fact that the city has concluded that some commercial interests outweigh its municipal interests in this context that it must give similar weight to all other commercial advertising. Thus, offsite commercial billboards may be prohibited while onsite commercial billboards are permitted." (*Metromedia, U.S., supra,* 453 U.S. at p. 512 [69 L.Ed.2d at pp. 817-818].)

The regulatory scheme under consideration in the instant case does not attempt to provide what type of noncommercial speech may be placed on signs, either offsite or onsite signs. An owner of property may decide to allow a noncommercial sign by another person to be placed on his property as long as it meets the other regulations regarding number of signs in each zoning district. A similar contention was considered in *Major Media of the Southeast* v. *City of Raleigh, supra,* 792 F.2d 1269, 1273 , wherein the court stated: "Naegele predicts that the owners of the property on which 'on premise' signs are placed will not allow placement of signs on their property or premises which contain non-commercial copy. Even if the contention should prove to be true, it derives from decisions of the individual property owners. It has nothing to do with the Raleigh ordinance, itself, which by its very terms does not affect non-commercial signs. The owners of such premises are free to place or to refrain from placing the non-commercial messages of others on their premises." To compel a private individual to provide a forum for

views other than his own may infringe that person's right to free speech. (*Pacific Gas & Elec. Co.* v. *P.U.C. of California* (1986) 475 U.S. 1, 12-15 [89 L.Ed.2d 1, 10-12, 106 S.Ct. 903, 910-911] [rehg. den. 475 U.S. 1133 (90 L.Ed.2d 208, 106 S.Ct. 1667)]; *Miami Herald Publishing Co.* v. *Tornillo* (1974) 418 U.S. 241, 257-258 [41 L.Ed.2d 730, 740-742, 94 S.Ct. 2831].) A person has a greater interest in regards to his First Amendment rights on his own private property. (*Gonzales* v. *Superior Court* (1986) 180 Cal.App.3d 1116, 1124 [226 Cal.Rptr. 164].)

From the above discussion, it is clear that it does not violate the First Amendment to give property owners more rights in regards to placing a commercial sign on their property. The United States Supreme Court has even stated that a local entity may totally ban offsite commercial messages while permitting onsite commercial signs. The Supreme Court held: "Insofar as the city tolerates billboards at all, it cannot choose to limit their content to commercial messages; the city may not conclude that the communication of commercial information concerning goods and services connected with a particular site is of greater value than the communication of noncommercial messages." (*Metromedia, U.S., supra,* 453 U.S. at p. 513 [69 L.Ed.2d at p. 818].) In the instant case the regulatory scheme under consideration allows noncommercial signs in every place that a commercial sign is permitted.

The fact that property owners may have more rights in regards to noncommercial signs does not make the regulatory scheme of the City unconstitutional. Ordinance No. 1838 permits nonproperty owners to place noncommercial signs on another person's property with the owner's permission. The fact that the property owner is free to refuse the nonproperty owner permission to place such a sign, does not affect the constitutionality of the regulatory scheme since noncommercial signs are permitted everywhere that commercial signs are permitted. The fact that the effect of Ordinance No. 1838 is to allow property owners more discretion regarding the noncommercial signs he allows on his property, does not render the ordinance invalid. As noted above a private individual has more protection under the First Amendment right to free speech on his own property. The proper judicial role is to conduct a case inquiry into the competing concerns of the state and the interests protected by the guarantee of free expression. One competing interest is the private interests protected by the First Amendment. (*Metromedia, U.S., supra,* 453 U.S. at p. 517, fn. 22 [69 L.Ed.2d at p. 821, fn.22].) The competing interests between a nonproperty owner's right to place a noncommercial sign on another's property, does not outweigh the significant free speech right a person has to control his First Amendment rights on his own property. To hold otherwise would infringe upon the property owner's right of free speech.

Furthermore, such discrimination between offsite billboards and onsite billboards without reference to the contents of the message of the billboard has been stated by the California Supreme Court to be valid. "In short, given the invalidity of a ban on all off-site billboards, the legislative purpose may be better served by an ordinance which bans most offsite billboards than by one which draws a distinction based on the content of the billboard's message." (*Metromedia (Cal.) II, supra,* 32 Cal.3d at p. 191.) Ordinance No. 1838 essentially permits onsite signs without limitations as to the contents of the message. It is clear that a City may permit onsite signs while restricting offsite signs. The only restrictions are that noncommercial messages must be permitted in locations where commercial messages are permitted, and the local entity cannot regulate what type of noncommercial message which is permissible; in other words a government entity must be neutral in its regulation of noncommercial speech. (*Metromedia, U.S., supra,* 453 U.S. at pp. 513, 514, 515, 517 [69 L.Ed.2d at pp. 818, 819, 820, 821].) *Metromedia, U.S.* held that since the City has concluded that its official interests are not as strong as private interests in onsite commercial advertising, it may not claim that those same official interests outweigh private interests in noncommercial communications. (*Id.,* at pp. 517-521 [69 L.Ed.2d at pp. 820-823].) The United States Supreme Court stated: "The fact that the city may value commercial messages relating to onsite goods and services more than it values commercial communications relating to offsite goods and services does not justify prohibiting an occupant from displaying its own ideas or those of others." (*Id.,* at p. 513 [69 L.Ed.2d at p. 818].)

Thus, a local government may distinguish onsite signs from offsite when the message is commercial, as well as distinguish between onsite signs from offsite signs when the message is noncommercial if other abovementioned requirements are satisfied.

## IX

Next Ryan asserts that the regulatory scheme of the City effectively bans all offsite signs. Ordinance No. 1103 permits offsite commercial signs only in the general commercial (CG) zoning districts and, upon obtaining a use permit therefor in the unclassified (U) zoning districts. The City in its letter brief states that Ryan has 16 signs located in the CG district. The City further states that Ryan could place substantially more billboards in this district. At trial there was testimony that if Ryan removed all nonconforming signs, its remaining signs would reach approximately 50 percent of the population of the City daily.

Thus, there is no total ban on offsite billboards. Ryan's argument seems to be that restricting offsite commercial signs to CG zones unduly restricts

its right to place a greater number of billboards in areas more convenient to it. Such a contention does not raise a constitutional issue. The inquiry for First Amendment purposes is not concerned with economic impact; rather, it looks only to the effect of an ordinance upon freedom of expression. (*Lakewood, Ohio Cong. of Jehovah's Witnesses, Inc.* v. *City of Lakewood* (1983) 699 F.2d 303, 307 [cert . den. 464 U.S. 815 (78 L.Ed.2d 85, 104 S.Ct. 72).) Furthermore, Ryan's argument overlooks the statement of the United States Supreme Court in *Metromedia, U.S., supra.* 453 U.S. at page 512 [69 L.Ed.2d at p. 818], "offsite commercial billboards may be prohibited while onsite commercial billboards are permitted."

X

Finally Ryan attacks the regulatory scheme as follows: "Note also the troubling *express prohibition* in most areas of Salinas under the city's sign ordinance (both as originally adopted *and* as most recently revised) of any 'signs characterizing a person or object.' (§§ 37-236.31(C)(5), 37-236.32(C)(5), 37-236.33(C)(5).) Such signs may be displayed in other areas of the city with a conditional use permit subject to zoning administrator approval, but only if they are 'desirable and in character with the area where they are located.' [Citations.] It requires but little imagination to appreciate the many types of noncommercial messages which could easily be prohibited through the application of these provisons by an over-zealous city official." (Italics in original.)

This final contention is adequately addressed by the City in its letter brief (filed Apr. 4, 1985) as follows: "Examples of those signs would be a sign shaped like a cowboy on a western store, a sign in the shape of a cow on a dairy, a Ronald McDonald shaped sign on a McDonalds store, and so on. [¶] Unlike a conditional use permit requirement for adult uses, such as adult book stores, where the granting authority is considering a specific use, the above sign regulations are content neutral. [¶] The sign shape, not the message, is the concern. There is no requirement that the sign sponsor must disclose the message of the sign before a conditional use permit is to be granted. The shape controls. The purpose of the regulation is to prohibit or limit a sign of a particular shape which may be considered distracting. The commercial or non-commercial message is irrelevant to the goal of the City in this regard. Thus, there is no concern regarding 'an over-zealous City official."

We reverse the judgment as to sign A-15 for the reason that Ryan is entitled to compensation for removal of the sign. The judgment of the trial court enjoining Ryan from maintaining the signs listed in exhibit A to the complaint and ordering their removal is affirmed. The City's Ordinance No.

1103 as amended in Ordinance Nos. 1488, 1020, and 1838 are partially preempted by the Outdoor Advertising Act and are to that extent invalid. Ryan to bear costs on appeal.

Scott, J., and Merrill, J., concurred.