[No. A028919. First Dist., Div. Two. June 11, 1987.]

CITY AND COUNTY OF SAN FRANCISCO, Plaintiff and Appellant, v.
ELLER OUTDOOR ADVERTISING et al., Defendants and Respondents.

[No. A029026. First Dist., Div. Two. June 11, 1987.]

CITY AND COUNTY OF SAN FRANCISCO, Plaintiff and Appellant, v.
FOSTER & KLEISER et al., Defendants and Respondents.

646

## Counsel

Louise H. Renne, City Attorney, Paula A. Jesson and Andrew A. Schwartz, Deputy City Attorneys, for Plaintiff and Appellant.

Paul M. Hupf, Steven L. Pollak, Tara M. Morgan, Hupf & Pollak and Hupf, Pollack & Morgan for Defendants and Respondents.

## Opinion

**SMITH, J.**—In these two actions which have been consolidated for purposes of this appeal, the City and County of San Francisco (hereinafter the City) brought complaints for injunctive relief against two billboard companies, defendants and respondents Eller Outdoor Advertising (Eller) and Foster and Kleiser (F & K), as well as the owners of certain real properties who lease space to Eller and F & K for the purpose of maintaining outdoor advertising structures. The City sought to compel removal of general advertising signs located within the "Market Street Special Sign District," in violation of San Francisco's sign ordinance (§ 601 et seq. of the San Francisco Planning Code). The City suffered a judgment of dismissal for failure to bring the causes to trial within the mandatory period prescribed by former Code of Civil Procedure section 583, subdivision (b). Prior to the dismissal, however, the City moved for summary judgment. The motion was denied because the trial court determined that the constitutionality of the ordinance under which the City brought these actions was a triable issue of fact.

The City does not contest the merits of the dismissal order, but contends that the point does not matter because the trial court should have granted summary judgment in its favor. We therefore face the issue of whether the constitutionality of San Francisco's sign ordinance should have been upheld as a matter of law in the summary judgment proceedings below. We conclude that the ordinance passes constitutional muster except in certain minor respects; that offending provisions can be judicially construed so as to avoid constitutional difficulties; and that the City was therefore entitled to injunctive relief.

## BACKGROUND

San Francisco's board of supervisors (the Board) first enacted a sign ordinance (art. 6, of the San Francisco Planning Code) in 1965. Among the stated "Special Purposes" of the ordinance were the protection and enhancement of property values, the preservation of the character and dignity of public buildings and the "distinctive appearance of San Francisco which is produced by its unique geography, topography, street patterns, skyline and architectural features," the promotion of business development, the lessening of the objectionable effects of competition in the placement and size of signs, the aid in the attraction of tourists to the City, and the reduction of hazards to motorists and pedestrians. The ordinance regulates the size, placement and location of signs throughout the City. The definition of "sign" as set forth in section 602.18[1] is a broad one, covering virtually every outdoor display, symbol, or inscription consisting of characters used for communicative purposes.[2] As will be discussed in more detail in a later part of this opinion, section 603 of the ordinance exempts certain signs altogether from the scope of the ordinance, such as public notices, traffic control devices, temporary political campaign posters, house numbers and religious symbols.[3]

[1] All future "section" references are to the San Francisco Planning Code.

[2] The term "Sign" is defined by section 602.18, in pertinent part, as follows: "Any structure, part thereof, or device, or inscription which is located upon, attached to, or painted projected or represented on any land or right-of-way, or on the outside of any buildng or structure including an awning, canopy, marquee or similar appendage, or affixed to the glass on the outside or inside of a window so as to be seen from the outside of the building, and which displays or includes any numeral, letter, word, model, banner, emblem, insignia, symbol, device, light, trademark, or other representation used as, or in the nature of, an announcement, advertisement, attention-arrester, direction, warning, or designation by or of any person, firm, group, organization, place, commodity, product, service, business, profession, enterprise or industry."

[3] The full text of section 603 reads as follows: "EXEMPTED SIGNS. Nothing in this Article 6 shall apply to any of the following signs: (a) Official public notices, and notices posted by public officers in performance of their duties.

"(b) Governmental signs for control of traffic and other regulatory purposes, street signs, danger signs, railroad crossing signs, and signs of public service companies indicating danger and aids to service or safety.

"(c) Temporary display posters, without independent structural support, in connection with political campaigns and with civic non-commercial health, safety and welfare campaigns, provided that in R districts such posters shall be removed within 60 days following the conclusion of the campaign.

"(d) Flags, emblems, insignia and posters of any nation or political subdivision, and temporary displays of a patriotic, religious, charitable or civic character.

"(e) House numbers, whether illuminated or not, 'no trespassing', 'no parking', and other warning signs.

"(f) Commemorative plaques placed by recognized historical agencies.

"(g) Signs within a stadium, open-air theater or arena which are designed primarily to be viewed by patrons within such stadium, open-air theater or arena.

A critical distinction created by the ordinance is that between a "General Advertising Sign" which directs attention to a "business, commodity, industry or other activity which is sold, offered or conducted *elsewhere than on the premises* upon which such sign is located ..." (§ 602.7, italics added) and a "Business Sign," which "directs attention to a business, commodity, service, industry or other activity which is sold, offered, or conducted, other than incidentally, *on the premises* upon which such sign is located...." (§ 602.3, italics added.) The distinction is one that is frequently made in the enactment of local sign ordinances and is commonly referred to as the difference between "offsite" signs and "onsite" signs. (See *Metromedia, Inc.* v. *San Diego* (1981) 453 U.S. 490, 498-499 [69 L.Ed.2d 800, 808-810, 101 S.Ct. 2882], citing *Suffolk Outdoor Advertising Co.* v. *Hulse* (1977) 43 N.Y.2d 483 [402 N.Y.S.2d 368, 373 N.E.2d 263], app. dism. 439 U.S. 808 [58 L.Ed.2d 101, 99 S.Ct. 66].)

The sign ordinance designates certain areas of the City, such as those near parks, freeways, certain scenic streets and residential districts, and subjects them to special sign regulation. (§§ 608.1-608.10.)

In 1968, the voters of San Francisco approved a $24.5 million bond issue for the reconstruction and improvement of downtown Market Street. Market Street is the main thoroughfare for downtown traffic; it attracts more pedestrians than any other street in the city; it is the center for public ceremonies, parades and much tourist activity and is the location of many landmark buildings. The development plan called for the installation of specially designed brick sidewalks, street furnishings, plazas and abundant landscaping in and along the avenue.

As an outgrowth of the 1965 sign legislation and the Market Street development project, the Board unanimously enacted Ordinance No. 125.70 (adding § 608.8 to the Planning Code), which created the Market Street Special Sign District (MSSSD). The stated purpose of the district's creation was to further the beautification project and to enhance street appearance and economic stability of the redevelopment area through regulation of street signs, many of which were deemed to be harmful to the aesthetic quality of the environment and incompatible with the surroundings.[4]

---

"(h) Religious symbols attached to buildings if not projecting beyond any street property line or building set-back line.

"(i) Flags indicating weather conditions, and single flags which are emblems of business firms, enterprises and other organizations."

[4]One of the policy statements issued in conjunction with the creation of the MSSSD declares: "Signs are another leading cause of street clutter. Where signs are large, garish and clashing they lose their value as identification or advertising and merely offend the viewer. Often these signs are overhanging or otherwise unrelated to the physical qualities of the

Section 608.8 comprises the regulatory scheme for the MSSSD and establishes standards for the height and projection of sign structures. In addition, "General Advertising Signs" (offsite signs) within the district are absolutely prohibited. (§ 608.8(b).) On the other hand, "Business Signs" (onsite signs) are allowed throughout the MSSSD, provided they conform to the height and projection specifications prescribed in the code.[5]

Section 609.10 initially provided for an amortization period of three years during which all offsite signs were to be removed. In 1971, this section was amended to extend the amortization period to five years from the enactment of the MSSSD ordinance *or* 30 days following substantial completion of the Market Street development project, whichever was later.[6] On February 18,

---

buildings on which they are placed. Signs have an important place in an urban environment, but they should be controlled in their size and location."

[5] The texts of sections 602.3, 602.7 and 608.8(b) defining "General Advertising" and "Business Signs," and prohibiting the former in the MSSSD, state, in pertinent part: "Sec. 602.7. *General Advertising Sign.* A sign which directs attention to a business, commodity, industry or other activity which is sold, offered or conducted elsewhere than on the premises upon which such sign is located, or to which it is affixed, and which is sold, offered or conducted on such premises only incidentally if at all."

"Sec. 602.3. *Business Sign.* A sign which directs attention to a business, commodity, service, industry or other activity which is sold, offered, or conducted, other than incidentally, on the premises upon which such sign is located, or to which it is affixed. Where a number of commodities with different brand names or symbols are sold on the premises, up to one-third of the area of a business sign, or 25 square feet of sign area, whichever is the lesser, may be devoted to the advertising of one or more of those commodities by brand name or symbol as an accessory function of the business sign, provided that such advertising is integrated with the remainder of the business sign and provided also that any limits which may be imposed by this Code on the area of individual signs and the area of all signs on the property are not exceeded."

"Sec. 608.8. *On and Near Market Street from The Embarcadero to the Central Skyway Overpass.* There shall be a special sign district known as the Market Street Special Sign District in the vicinity of Market Street from The Embarcadero to the Central Skyway overpass as designated on Sectional Map SSD of the Zoning Map of the City and County of San Francisco. . . . With respect to said special sign district, the following regulations shall apply:
". . . . . . . . . . . . . . . . . . .
"(b) *General Advertising Signs.* . . .
"1. No general advertising sign shall be permitted at any location within said special sign district; and
"2. No general advertising sign shall be located within 200 feet of said special sign district, if any portion of a face of such sign would be visible from any point on a street, alley or plaza within the special sign district."

[6] The text of this section reads, in pertinent part: "Sec. 609.10. *On and Near Market Street from The Embarcadero to the Central Skyway Overpass.* (a) General advertising signs. *Any lawfully existing general advertising sign* within the Market Street Special Sign District, other than such a sign located on a wall immediately adjacent to the establishment to which it directs attention, *shall be removed within five years after the effective date of said special sign district* or such later date as the location of such sign may be designated as part of said special sign district; *provided, however, that if the public street and plaza improvements* within any of the sections of the Market Street Special Sign District listed below *have not been substantial-*

1977, the Board amended section 609.10(a) to add a declaration that as of May 18, 1976 (six years after the enactment of the MSSSD ordinance), the Market Street improvements were deemed substantially complete and the amortization period for removal of general advertising signs had expired.

## PROCEDURAL HIGHLIGHTS

When respondents refused to remove certain of their advertising billboards following the February 1977 amendment declaring the end of the amortization period, the City commenced the present actions for injunctive relief. The sole ground of the City's claim for relief was that eight billboards maintained by Eller and twenty-five by F & K were a public nuisance, to wit, that they were in violation of the prohibition against such structures set forth in the San Francisco Planning Code.

Respondents answered and cross-complained for declaratory and injunctive relief, seeking a declaration to the effect that the ordinances which the City relied upon to compel removal of the signs were "unconstitutional and void" as applied to them.

The actions were filed in 1977, but the City did not file an at-issue memorandum until May 10, 1983. Respondents countered with a motion to dismiss for failure to bring the cause to trial within five years. The City successfully opposed the motion on the ground that the court's jurisdiction was stayed for two years by a legislatively imposed statewide moratorium on local actions seeking the removal of advertising displays. (See former Bus. & Prof. Code, § 5412.5.)

In February 1984, the City brought a motion to advance the case for trial, representing that the mandatory dismissal period prescribed by former Code of Civil Procedure section 583 would expire on May 8, 1984. The trial court denied the motion. The City brought a motion for summary judgment soon afterwards. The motion was exhaustively briefed; voluminous declarations were filed in support of and in opposition to the motion.

The court denied summary judgment, but summarily adjudicated all issues in the City's favor, except for those pertaining to the constitutionality

---

*ly completed at the end of said five year period* in accordance with the architectural plans entitled "Market Street Reconstruction." Transit Task Force File No. 810.00R1 through 810.28R1, dated September 10, 1970, and 'Surface Plan—Hallidie Plaza.' Transit Task Force File No. 1000, dated July 15, 1970, including permanent pavement of sidewalk and roadway areas, planting of trees and placement of furnishings, *then said general advertising signs within any such section need not be removed until 30 days after the date of substantial completion of said improvements in the section in which said signs are located.*" (Italics added.)

of the Market Street Special Sign Ordinance. Although respondents tendered other purported controverted issues, it is clear from the court's order that it deemed the only triable controversy to be "[t]he application of the ... Sign District Ordinance to the expression guaranteed by the First Amendment of the United States Constitution...."

Because of the court's earlier denial of the motion to advance, the injunction actions could not be brought to trial within the mandatory dismissal period, and were accordingly dismissed on respondents' motion in August 1984. The City timely appealed from the judgments of dismissal.

APPEAL

I.

Respondents imply, without expressly stating, that the City cannot attack the trial court's order denying summary judgment because its only appeal is from the judgment of dismissal. ■ It is, of course, axiomatic that an order granting only partial summary judgment is nonappealable. (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 76, pp. 100-101; Code Civ. Proc., § 437c, subds. (f), (j).) However, if as the City contends, the trial court should have granted full summary judgment on both cases in favor of the City, the actions before us would have been "brought to trial" within the meaning of former Code of Civil Procedure section 583, subdivision (b) (*Lemaire, Faunce & Katznelson* v. *Cox* (1985) 171 Cal.App.3d 297, 301 [217 Cal.Rptr. 281]; *King* v. *State of California* (1970) 11 Cal.App.3d 307, 310 [89 Cal.Rptr. 715]) and the ensuing judgment of dismissal under that section would have been erroneous. (*Southern Pacific Co.* v. *Seaboard Mills* (1962) 207 Cal.App.2d 97, 101-105 [24 Cal.Rptr. 236].)

Code of Civil Procedure section 906 permits this court to review, upon appeal from a judgment, "any intermediate ruling, proceeding, order or decision which involves the merits or necessarily affects the judgment or order appealed from...." This review includes orders partially granting or partially denying summary judgment. (*Etienne* v. *DKM Enterprises, Inc.* (1982) 136 Cal.App.3d 487, 489 [186 Cal.Rptr 321]; *Lackner* v. *La Croix* (1979) 25 Cal.3d 747, 753 [159 Cal.Rptr. 693, 602 P.2d 393].)

The City does not attack the trial court's denial of its motion to advance or the order dismissing these actions for lack of prosecution. It can, and does, question the propriety of the order denying it full summary judgment. This appeal must therefore either stand or fall on our determination of

whether the superior court erred in its disposition of the summary judgment motions.

## II.

Aside from raising constitutional issues in affirmative defense to the actions, respondents opposed summary judgment on the alternative ground that there was a triable issue of fact concerning whether the Market Street reconstruction was "substantially complete" so as to trigger the end of the amortization period as it was defined in section 609.10(a). (See fn. 6, *ante.*)

The trial court rejected respondents' claims and expressly found, as a matter of law, that the amortization period was proper and that the reconstruction had been substantially completed by 1977. Respondents now contend that the trial court should not have granted summary adjudication of the "substantial completion" issue, and that therefore denial of complete summary judgment was proper regardless of the constitutionality of the sign ordinance.[7] This assertion lacks merit.

Respondents' argument is premised on the language of section 609.10 which states that if the improvements within the Market Street sign district "have not been *substantially completed* " in accordance with the architectural plans therefor, then the general advertising signs within the MSSSD need not be removed "until 30 days after the date of substantial completion of said improvements in the section in which said signs are located." (§ 609.10, italics added.) Respondents argue that there was a triable issue as to the "substantiality" of the completion work, since the original plans called for removal of overhead wires and streetcar tracks, neither of which ever took place.

In 1977, the Board took testimony and held special hearings concerning the "substantial completion" issue. Following these hearings, the Board amended section 609.10 with an express declaration that, as of May 18, 1976, the Market Street improvements were "substantially completed" as defined by this section, that the amortization period was over, and that "all general advertising signs ... *shall be removed forthwith.*" (Italics added.) The record below contains unrefuted evidence that, as of 1976, the improvements in the sections of Market Street in which respondents' signs were

---

[7] We note that respondents have standing to raise errors by the trial court for the purpose of showing whether or not appellant City was prejudiced by the ruling below. (Code Civ. Proc., § 906; 9 Witkin, *op.cit. supra,* § 249, pp. 255-256; *Kasel* v. *Remington Arms Co.* (1972) 24 Cal.App.3d 711, 728 [101 Cal.Rptr. 314].)

located were at least 90 percent complete. Subsequently the Board decided not to remove the streetcar tracks, overhead wires or passenger islands, in the interest of preserving transit service and the historical and picturesque appearance of the area.

Since we have no record of the evidence before the Board when it made its determination of substantial completion in 1977, that determination is *presumed* valid and must be upheld if any state of facts supporting it can be conceived. (*People* v. *Trantham* (1984) 161 Cal.App.3d Supp. 1, 14 [208 Cal.Rptr. 535]; see *Minnesota* v. *Clover Leaf Creamery Co.* (1981) 449 U.S. 456, 464 [66 L.Ed.2d 659, 668-669, 101 S Ct 715].) █ As stated in *Lockard* v. *Los Angeles* (1949) 33 Cal.2d 453, 462 [202 P.2d 38, 7 A.L.R.2d 990]: "[N]either the trial nor appellate courts are authorized to 'review' legislative determinations. The only function of the courts is to determine whether the exercise of legislative power has exceeded constitutional limitations.... [I]f the reasonableness of the ordinance is fairly debatable, the legislative determination will not be disturbed." (Accord *Stribling* v. *Mailliard* (1970) 6 Cal.App.3d 470, 473 [85 Cal.Rptr. 924].)

█ The Board's determination that the Market Street project was substantially complete as of May 1976 was not only *not* manifestly unreasonable but was supported by abundant evidence in the City's moving papers. The completion issue was therefore not "triable" by the court simply because evidence may have been conflicting. Once the City demonstrated that the Board's finding was not irrational, arbitrary or capricious, the court's inquiry was over. ██ The trial court correctly granted the City summary adjudication on this issue.[8]

### III.

The central aspect of San Francisco's sign ordinance is the *prohibition* on general advertising ("offsite") signs and the *permission* of business ("onsite") signs, whatever their nature, within specially designated areas of the City. In respondent's case the prohibition extends throughout the Market Street Special Sign District. Thus, property owners within the MSSSD may not display signs designating the goods, services or activities of others, but

---

[8] As the City points out, the logical thrust of respondents' contentions is that once a given set of architectural plans has been approved, the City's governing board is powerless to modify or delete certain aspects without postponing the amortization period in perpetuity. Respondents' construction of section 609.10 is therefore at war with the fundamental principle that statutes should be construed in a reasonable and commonsense way, and not in a manner productive of absurd consequences. (*Anaheim Union Water Co.* v. *Franchise Tax Board* (1972) 26 Cal.App.3d 95, 105 [102 Cal.Rptr. 692].)

they may display signs that communicate messages pertaining to the goods, services or activities which are offered on the premises. The ordinance does not draw any distinction between so-called "commercial" and "noncommercial" advertising.

Local sign and billboard legislation has frequently been the subject of litigation in California and has been met with mixed reviews by the courts. (E.g., *City of Salinas* v. *Ryan Outdoor Advertising, Inc.* (1987) 189 Cal.App.3d 416 [234 Cal.Rptr. 619] [ban on offsite commercial billboards in specified zoning districts upheld]; *Gonzales* v. *Superior Court* (1986) 180 Cal.App.3d 1116 [226 Cal.Rptr. 164] [ordinance banning temporary noncommercial announcement signs struck down]; and *Lehman* v. *City of Shaker Heights* (1974) 418 U.S. 298 [41 L.Ed.2d 770, 94 S.Ct. 2714] [ban on political advertising on city transit bus held valid]; *City Council* v. *Taxpayers for Vincent* (1984) 466 U.S. 789 [80 L.Ed.2d 772, 104 S.Ct. 2118], and *Sussli* v. *City of San Mateo* (1981) 120 Cal.App.3d 1 [173 Cal.Rptr. 781] [ordinances prohibiting the posting of signs on public property held permissible]; *Metromedia, Inc.* v. *San Diego, supra,* 453 U.S. 490 [citywide plan for eliminating most billboards but permitting certain others held unconstitutional]; *Bohannan* v. *City of San Diego* (1973) 30 Cal.App.3d 416 [106 Cal.Rptr. 333] [zoning ordinance restricting signs within public view in historical section of town upheld]; *Dulaney* v. *Municipal Court* (1974) 11 Cal.3d 77 [112 Cal.Rptr. 777, 520 P.2d 1] [standardless licensing scheme for posting signs on utility poles held invalid].)

It is well established that because signs and billboards provide a forum for the expression of ideas, any governmental regulation or prohibition thereof bears scrutiny under the First Amendment. (*City Council* v. *Taxpayers for Vincent, supra,* 466 U.S. at p. 803 [80 L.Ed.2d at pp. 785-786]; *Metromedia, Inc.* v. *San Diego, supra,* 453 U.S. at p. 501 [69 L.Ed.2d at pp. 810-811].) Even so-called "commercial speech" (speech proposing no more than a commercial transaction) "enjoys a substantial degree of First Amendment protection." (*Metromedia, supra,* 453 U.S. at p. 505 [69 L.Ed.2d at p. 813], citing *Virginia Pharmacy Board* v. *Virginia Consumer Council* (1976) 425 U.S. 748, 770-773 [48 L.Ed.2d 346, 363-365, 96 S.Ct. 1817].)

However, it is by now equally well recognized that outdoor signs, because of their intrusive nature, may properly be subjected to governmental regulation to promote aesthetics and traffic safety. (*Metromedia, supra,* 453 U.S. at pp. 502, 508-509 [69 L.Ed.2d at p. 811]; *Vincent, supra,* 466 U.S. at pp. 806-807 [80 L.Ed.2d at pp. 787-788].) As the United States Supreme Court has observed: " 'The radio can be turned off, but not so the billboard

or street car placard.' " (*Lehman* v. *City of Shaker Heights, supra,* 418 U.S. at p. 302 [41 L.Ed.2d at p. 776], quoting from *Packer Corp.* v. *Utah* (1932) 285 U.S. 105, 110 [76 L.Ed. 643, 647, 52 S.Ct. 273, 79 A.L.R. 546].)

■ The approach taken in virtually every case where outdoor sign regulations are challenged as impermissible restraints on free speech is for the court to "strike the proper balance between the right of free expression and legitimate governmental interests." (*Sussli* v. *City of San Mateo, supra,* 120 Cal.App.3d 1, 8; see also *Linmark Associates, Inc.* v. *Willingboro* (1977) 431 U.S. 85, 91 [52 L.Ed.2d 155, 160-161, 97 S.Ct. 1614].)

■ We disagree with both respondents' assertion and the trial court's conclusion that the record was insufficient for the court to resolve the First Amendment question as a matter of law. The City, in its motion for summary judgment, presented considerable evidence showing the history and background surrounding the enactment of San Francisco's sign ordinance, the purposes behind the legislation and the goals sought to be achieved by the City in passing it, and the aesthetic, economic and social benefits which would accrue from implementation of the regulatory scheme within the Market Street district. In opposition, respondents offered declarations to the effect that billboards are an important and useful means of communication, not merely of commercial messages but political speech; that "onsite" signs are of no use to some advertisers who must have "standardized" displays; that billboards convey messages to "a broad and universal segment of the community"; and that respondents would suffer economic detriment by having their outdoor displays removed. None of the foregoing "facts" contained in respondents' affidavits were or are disputed by the City. Nor is there any hint in the record that the evidence would have been any different had the case been tried by the court rather than submitted through the vehicle of a summary judgment motion. The court's task of weighing competing interests is the same.

The trial court could not " ' "escape the task of assessing the First Amendment interest at stake and weighing it against the public interest allegedly served by the regulation" ' "(*Metromedia, supra,* 453 U.S. at p. 502 [69 L.Ed.2d at p. 812]) merely by classifying the constitutional question as a triable issue of fact. ■ ■ As the California Supreme Court has observed: "When ... the impairment of First Amendment rights appears, and when, as here, the facts constituting such impairment are not contradicted, the question as to whether such impairment is permissible is one of law and not of fact, and not the subject of ... 'expert' testimony.... [A] court must weigh the extent of the impairment against both the importance of the governmental interest and the substantiality of the threat which the

forbidden speech or related activity poses to that interest." (*L.A. Teachers Union* v. *L.A. City Bd. of Ed.* (1969) 71 Cal.2d 551, 556 [78 Cal.Rptr. 723, 455 P.2d 827]; accord *Sussli* v. *City of San Mateo, supra,* 120 Cal.App.3d at p. 9.) The trial court erred in failing to engage in this balancing process. However, its failure is of academic importance at this stage, since, as a reviewing court it is our responsibility to make an independent examination of the First Amendment issue as a matter of law. (*Sussli* v. *City of San Mateo, supra,* at p. 9.)

IV.

In *Metromedia, Inc.* v. *San Diego, supra,* 453 U.S. 490, the United States Supreme Court reviewed an attempt by the City of San Diego to ban all outdoor advertising except "onsite" signs identifying *commercial* goods and services. Although the California Supreme Court initially upheld the constitutionality of the ordinance (*Metromedia, Inc.* v. *San Diego* (1980) 26 Cal.3d 848 [164 Cal.Rptr. 510, 610 P.2d 407]) a "badly fragmented and bitterly divided United States Supreme Court" reversed. (See Note (1981) 95 Harv. L.Rev. 211, 212.) Despite the emergence of three distinct schools of thought in *Metromedia,* however, a clear majority—seven of the nine justices—expressly concluded that the city's substantial and weighty interests in minimizing unpleasant formats for expression and promoting safety and aesthetics justified an absolute ban on all *commercial offsite* outdoor signs. After reaffirming that traffic safety and the reduction of visual blight were legitimate, substantial governmental goals, four justices in the plurality and three dissenting justices concluded that the offsite prohibition directly advanced the government's interest and reached no further than necessary to accomplish its objective, thereby satisfying the test for the validity of restrictions on commercial speech as articulated in *Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n.* (1980) 447 U.S. 557, 563-566 [65 L.Ed.2d 341, 348-351, 100 S.Ct. 2343]. (453 U.S. at pp. 507-510 [69 L.Ed.2d at pp. 814-817].) "If the city has a sufficient basis for believing that billboards are traffic hazards and are unattractive, then obviously the most direct and perhaps the only effective approach to solving the problems they create is to prohibit them. The city has gone no further than necessary in seeking to meet its ends. Indeed, it has stopped short of fully accomplishing its ends: it has not prohibited all billboards, but allows onsite advertising and some other specifically exempted signs." (453 U.S. at p. 508 [69 L.Ed.2d at p. 815], see also dis. opns. of Justices Stevens, Burger and Rehnquist at pp. 552-553, 560-561, 569-570 [69 L.Ed.2d at pp. 842-843, 848, 854-855].)

Subsequently, in *City Council* v. *Taxpayers For Vincent, supra,* 466 U.S. 789, the court, by a 6-3 majority, upheld a Los Angeles ordinance banning

*all* signs, commercial as well as noncommercial, on public property. While recognizing that the ordinance reduced the total availability of free communication and therefore presented a First Amendment problem (*id.* at pp. 803-804 [80 L.Ed.2d at pp. 785-786]), the court ruled that the ordinance was a constitutionally permissible restriction on time, place and manner of speech, relying on three primary considerations: (a) the "weighty, essentially esthetic interest" which municipalities have in reducing visual clutter, (b) the "content-neutrality" of the regulation (i.e., the prohibition on all signs regardless of subject matter), and (c) the widespread availability of alternative channels of communication, since the proscription did not extend to private property. (See 466 U.S. at pp. 811-815. [80 L.Ed.2d at pp. 791-794])

■ *Metromedia* and *Vincent* are convincing authority in support of the prohibition of all offsite advertising in the MSSSD set forth in section 608.8(b) of the San Francisco ordinance. San Francisco's indisputable interests in reducing traffic hazards and beautifying a vital area of the City[9] clearly justify a content-neutral ban on offsite signs and billboards. Furthermore, because the prohibition is restricted to only certain sections of town deemed to be of special cultural, historic or scenic importance, the City's interests clearly outweigh any incidental infringement on First Amendment rights. (See *Bohannan* v. *City of San Diego, supra,* 30 Cal.App.3d 416, 422-424.) Respondent billboard companies can, and do, maintain numerous general advertising signs throughout other sections of the City which are not affected by the offsite ban. The sign ordinance thus leaves abundant alternative forums for the same communication; it is a legitimate exercise of police power controlling time, place and manner of expression in a limited, constitutionally permissible fashion. (*Vincent, supra,* 466 U.S. at p. 811; *Suffolk Outdoor Advertising, supra,* 43 N.Y.2d 483, 490; see also *Heffron* v. *Int'l Soc. for Krishna Consc.* (1981) 452 U.S. 640, 649-652 [69 L.Ed.2d 298, 307-309, 101 S.Ct. 2559].)

---

[9] In opposition to the summary judgment motion, respondents proffered the declarations of "experts" in the fields of psychology and architecture in an attempt to show that outdoor signs do not create traffic hazards and actually enhance rather than detract from the appearance of an urban environment. Such notions have already been emphatically rejected as a matter of law by both the California and United States Supreme Courts (*Metromedia, Inc.* v. *City of San Diego, supra,* 26 Cal.3d at pp. 858-861, and *Metromedia, Inc.* v. *San Diego, supra,* 453 U.S. at pp. 507-508 [69 L.Ed.2d at pp. 814-815].) "Expert" opinions of this nature have no relevance on constitutional questions to be resolved by the courts. (See *L. A. Teachers Union* v. *L. A. City Bd. of Ed., supra,* 71 Cal.2d at p. 556.) As Justice White has written, "[n]or can there be substantial doubt that the twin goals that the ordinance seeks to further— traffic safety and the appearance of the city—are substantial governmental goals. It is far too late to contend otherwise with respect to either . . . ." (453 U.S. at pp. 507, 508 [69 L.Ed.2d at pp. 814, 815].)

## V.

▮ The fact that the ordinance allows all forms of "onsite" advertising while prohibiting "offsite" messages does not impermissibly infringe upon First Amendment freedoms. San Francisco's judgment that the public has a stronger interest in identifying goods, services or activities conducted directly on the premises warrants differing treatment between offsite and onsite advertising signs. (*Metromedia, supra,* 453 U.S. at p. 512 [69 L.Ed.2d at pp. 817-818].) Moreover, the City could justifiably conclude that the strong interests of private property owners within the MSSSD in displaying messages concerning their own products, services or activities sufficiently outweighs the generalized governmental objective of minimizing visual blight. (*City of Salinas* v. *Ryan Outdoor Advertising, Inc., supra,* 189 Cal.App.3d 416, 430; see also *Newman Signs, Inc.* v. *Hjelle* (N.D. 1978) 268 N.W.2d. 741, 758-759, app. dism. (1979) 440 U.S. 901 [59 L.Ed.2d 449, 99 S.Ct. 1205].)

By permitting *all* forms of onsite signs, both commercial and noncommercial, within the MSSSD, San Francisco's sign legislation also avoids a major flaw found in the San Diego ordinance by the Supreme Court plurality in *Metromedia.* While imposing a general ban on offsite billboards throughout the city, San Diego permitted only onsite signs which referred to *commercial* goods and services offered on the property. (453 U.S. at p. 503 [69 L.Ed.2d at p. 812].) Since the court has "consistently accorded noncommercial speech a greater degree of protection than commercial speech ..." San Diego's legislation giving preferred status to commercial communication resulted in an "inversion" of First Amendment values. (*Id.* at p. 513 [69 L.Ed.2d at p. 818].) Because no reasonable justification for a regulation impacting more heavily on ideological expression than on commercial expression could be found, the *Metromedia* court found that the ordinance "reaches too far into the realm of protected speech" and was therefore unconstitutional on its face. (*Id.* at p. 521 [69 L.Ed.2d at p. 823].)[10] (Accord *John Donnelly & Sons* v. *Campbell* (1st Cir. 1980) 639 F.2d 6.)

San Francisco's ordinance does not suffer from the taint of First Amendment "inversion." By definition, a permissible onsite sign is one which

---

[10]The high court held the door open for a limiting construction of the ordinance by our state courts. (453 U.S. at p. 521, fn. 25 [69 L.Ed.2d at p. 823].) On remand, however, the California Supreme Court found that "the ordinance cannot reasonably be construed to avoid banning noncommercial signs" and therefore declined to apply any judicial construction which would avoid the constitutional defects noted by the United States Supreme Court. (*Metromedia, Inc.* v. *City of San Diego* (1982) 32 Cal.3d 180, 188-191 [185 Cal.Rptr. 260, 649 P.2d 902]; see discussion commencing at pp. 663-664, of this opinion, *post.*)

directs attention to a "business, commodity, service, industry or *other activity* which is sold, offered, *or conducted* other than incidentally, on the premises." (§ 602.3, italics added.) Thus, messages of any kind are permissible as long as they relate to some activity taking place on the property. Unlike San Diego's ordinance, San Francisco's does not require City officials to determine whether an offending sign is "commercial" or "noncommercial," only whether it is "onsite" or "offsite." By making the distinction turn upon a content-neutral factor, the City has maintained equanimity between commercial and noncommercial expression in a limited area of the City. In this respect the ordinance is consistent with the principles articulated in *Vincent.*[11]

## VI.

Having determined that the San Francisco sign ordinance, insofar as it restricts the proliferation of signs within the Market Street special district, comports with constitutional requirements, we must still address the issue of whether the citywide exemptions from the ordinance encounter First Amendment difficulties.

In addition to the "inversion" problem mentioned earlier, the San Diego ordinance in *Metromedia* contained a section which totally exempted certain categories of signs from the citywide ban on outdoor advertising. These categories included religious symbols, historical plaques and temporary political campaign signs. No other noncommercial or ideological signs were permitted. (453 U.S. at p. 514 [69 L.Ed.2d at p. 819].) The plurality found this selective treatment of permissible noncommercial speech to be constitutionally infirm: "Although the city may distinguish between the relative value of different categories of commercial speech, the city does not have the same range of choice in the area of noncommercial speech to evaluate the strength of, or distinguish between, various communicative interests.

---

[11] Respondents argue that since on-premise signs can only direct attention to activity occurring on the property, the San Francisco ordinance does indeed suffer from inversion, since this protection will primarily favor commercial as opposed to noncommercial enterprises. But if the City's greater tolerance for onsite signs results in a prevalence of commercial over noncommercial signs, that is a consequence of the use to which the property is put, not of the regulatory scheme. The ordinance does not concern itself with whether the message conveyed by the sign is commercial or noncommercial, only that it relates (other than incidentally) to onsite activity. (§ 602.3.) The fact, even if true, that property owners conduct more commercial than noncommercial activity (and therefore post more commercial signs) does not render an otherwise neutral offsite/onsite distinction unconstitutional. (See *City of Salinas* v. *Ryan Outdoor Advertising, Inc., supra,* 189Cal.App.3d 416, 430-431; *Major Media of the Southeast, Inc.* v. *City of Raleigh* (4th Cir. 1986) 792 F.2d 1269, cert. den. (1987) 479 U.S. 1102 [94 L.Ed.2d 185, 107 S.Ct. 1334].)

[Citations.] With respect to noncommercial speech, the City may not choose the appropriate subjects for public discourse...." (453 U.S. at pp. 514-515 [69 L.Ed.2d at p. 819].)

■ This holding is consistent with ample case authority declaring that, in the area of ideological speech, government may not restrict a given avenue of expression based on content or subject matter alone. (*Bolger* v. *Youngs Drug Products Corp.* (1983) 463 U.S. 60, 65 [77 L.Ed.2d 469, 476, 103 S.Ct. 2875]; *Consolidated Edison Co.* v. *Public Serv. Comm.* (1980) 447 U.S. 530, 535-536 [65 L.Ed.2d 319, 326-327, 100 S.Ct. 2326]; *Carey* v. *Brown* (1980) 447 U.S. 455, 462-463 [65 L.Ed.2d 263, 270-271, 100 S.Ct. 2286]; *Police Department of Chicago* v. *Mosley* (1972) 408 U.S. 92, 95-96 [33 L.Ed.2d 212, 216-217, 92 S.Ct. 2286]; *Gonzales* v. *Superior Court, supra,* 180 Cal.App.3d 1116, 1124.) The ironic and truly unfortunate aspect of the *Metromedia* opinion is that San Diego's commendable attempt to allow at least *some* noncommercial outdoor signs resulted in more First Amendment difficulty than if the City had totally *banned* noncommercial messages,[12] thereby giving rise to the bitter and perhaps deserving criticism by Justice Stevens in his dissent that the plurality finds an unconstitutional abridgment of speech "because it [the ordinance] does not abridge *enough* speech." (453 U.S. at p. 540 [69 L.Ed.2d at p. 835], italics added.)

■ San Francisco's attempt, in section 603 of the general ordinance, to carve out specific exemptions from the definition of the word "sign" in order to lessen the hardship of the ordinance on noncommercial forms of speech, encounters the same objection. Section 603 exempts from any of the requirements of the ordinance signs which include "[t]emporary display posters ... in connection with political campaigns and with civic non-commercial health, safety and welfare campaigns," "temporary displays of a patriotic, religious, charitable or civic character," "commemorative plaques," and "religious symbols attached to the buildings." (See fn. 3, *ante.*)

By permitting many, but not all categories of signs displaying ideological communication throughout the City, San Francisco transgresses *Metromedia's* prohibition against content-based discrimination in the area of noncommercial speech. (453 U.S. at pp. 514-515 [69 L.Ed.2d at p. 819].) Thus, on its face, section 603 of the ordinance is incompatible with the First Amendment principles articulated by the United States Supreme Court.

---

[12] The plurality in *Metromedia* expressly reserved judgment on the constitutionality of a total prohibition. (453 U.S. at p. 515, fn. 20 [69 L.Ed.2d at p. 819].)

Under *Metromedia,* the City cannot place itself in the position of evaluating between the strengths of various noncommercial communicative interests. (*Ibid.*)

## VII.

As the history of the *Metromedia* case illustrates, however, our inquiry does not end here. We must still engage in the task of determining whether the defect we have noted requires invalidation of the entire ordinance or whether the offending provisions can be construed in such a way as to save its constitutionality. (453 U.S. at p. 521, fn. 26 [69 L.Ed.2d at p. 823]; *Metromedia, Inc.* v. *City of San Diego, supra,* 32 Cal.3d 180, 182.)

It is the duty of the courts, wherever possible, to construe a statute in a manner which is reasonable, consistent with the statutory purpose, and eliminates doubts as to its constitutionality. (*In re Kay* (1970) 1 Cal.3d 930, 942 [83 Cal.Rptr. 686, 464 P.2d 142]; see also *Pryor* v. *Municipal Court* (1979) 25 Cal.3d 238, 253-254 [158 Cal.Rptr. 330, 599 P.2d 636].) In examining the legislation for such a construction, the court should seek an interpretation which preserves as much of the constitutional provisions of the statute as possible, but which the legislative body would have intended to put into effect had it foreseen the constitutional limitations. (*In re Edgar M.* (1975) 14 Cal.3d 727, 736 [122 Cal.Rptr. 574, 537 P.2d 406].) We may not, however, exercise our power in such a manner as would displace the fundamental legislative intent or would amount to a rewriting of the statute. (*Metromedia, Inc.* v. *City of San Diego, supra,* 32 Cal.3d at p. 187; *Blair* v. *Pitchess* (1971) 5 Cal.3d 258, 282 [96 Cal.Rptr. 42, 486 P.2d 1242, 45 A.L.R.3d 1206].)

In the state Supreme Court's reconsideration of *Metromedia* after remand from the United States Supreme Court, Justice Broussard, writing for the majority, concluded that the San Diego ordinance was not susceptible of a saving construction which would permit erection of all noncommercial offsite billboards.

The principal reason for the court's conclusion was that the ordinance itself manifested a clear and direct intent to impose a comprehensive ban on practically all noncommercial signs. (32 Cal.3d at pp. 190-191.) Thus, besides creating many practical enforcement problems, a construction which permitted all onsite and offsite noncommercial signs would amount to a judicial rewriting of the ordinance. (*Ibid.*)

San Francisco's ordinance differs from the one considered in *Metromedia* in two significant respects. First, as noted previously, by permitting *all* onsite noncommercial signs in the restricted districts, the ordinance pays equal respect to ideological and political speech as it does to commercial speech. Second, and more importantly, San Francisco's citywide exceptions for noncommercial speech reach across a far broader spectrum of communication than does San Diego's. Whereas the only significant ideologically oriented exception in the San Diego regulation was for temporary political election campaign signs (see 453 U.S. at p. 495, fn. 3 [69 L.Ed.2d at p. 807]), San Francisco permits "temporary display posters . . . in connection with political campaigns and with *civic non-commercial health, safety and welfare* campaigns. . ." as well as "temporary displays of a *patriotic, religious, charitable or civic* character." (§ 603, subds. (c) and (d); see fn. 3, *ante.*) When we consider the additional facts that the "offsite" prohibition extends only to certain limited sections of the City and that all "onsite" noncommercial signs are permitted, it becomes evident that there is very little noncommercial expression which is actually prohibited by the ordinance. To the contrary, the vast majority of noncommercial expression, even within special sign districts, is allowed.

In sum, while the San Diego ordinance evinced a clear intent to *ban* most noncommercial signs, the San Francisco ordinance demonstrates an intent by the legislators to *allow* most noncommercial signs. The exceptions to the San Francisco ordinance in the noncommercial field therefore bring it into approximate alignment with the City of Salinas ordinance recently upheld by Division Three of this court. (*City of Salinas* v. *Ryan Outdoor Advertising, supra,* 189 Cal.App.3d 416 [13]

In light of the ordinance's apparent purpose to allow most forms of noncommercial speech, little violence is done to the legislative purpose to interpret the exceptions created in subdivisions (c) and (d) of section 603 to embrace *all* categories of noncommercial messages, thereby preserving the ordinance's neutrality and saving it from the constitutional problem raised by the United States Supreme Court in *Metromedia*. Given the high degree of tolerance for noncommercial communication exhibited by San Francisco's sign legislation, we believe that, had the Board foreseen the First Amendment difficulties created by section 603, they would have chosen an

---

[13] Salinas's ordinance broadened the definition of permissible "onsite" signs to include any signs devoted to "a noncommercial message." (Salinas Ord. No. 1838 (N.C.S.); § 37-236.39; see 189 Cal.App.3d at p. 420, fn. 1.).

interpretation which broadened, rather than narrowed permissible areas of ideological expression.

Finally, in order to avoid vagueness problems with the term "temporary," we construe that phrase in accord with the modifying description set forth in section 603, subdivision (c) itself, i.e., signs "without independent structural support." (See fn. 3, *ante*.)[14]

We are aware that there may arise instances where it is difficult to distinguish "commercial" from "noncommercial" messages. (See *Metromedia, Inc.* v. *City of San Diego, supra,* 32 Cal.3d 180, 190, citing *Metromedia Inc.* v. *San Diego, supra,* 453 U.S. at pp. 536-540 [69 L.Ed.2d at pp. 832-835] (conc. opn. of Brennan, J.).) However, as our Division Three brethren have concluded, there is now enough judicial guidance in this area that practical application of the distinction will not be unduly burdensome. (*City of Salinas* v. *Ryan Outdoor Advertising, supra,* 189 Cal.App.3d at p. 429 citing *Major Media of the Southeast* v. *City of Raleigh, supra,* 792 F.2d 1269, 1272-1273.)[15]

We conclude that San Francisco's sign ordinance, as we have construed it herein, is constitutional and that the trial court erred in denying summary judgment to the City on constitutional grounds. Since we perceive no error in the trial court's ruling in favor of the City on the remaining issues presented for adjudication, it follows that the City is entitled to judgment.

However, the record is unclear as to whether one or more of respondents' signs may qualify as exempt under the ordinance as we have construed it. The cause must therefore be remanded to the trial court to determine which of the billboards in question the City was entitled to have removed.

---

[14]This construction also removes any perceived advantage created by the exception set forth in subdivision (h) (religious symbols attached to buildings). Signs attached to buildings, under the definition set forth in section 602.2, cannot have independent structural support.

[15]An alternative method of construction advanced by the City is to simply sever section 603 from the remainder of the ordinance. The resulting ordinance would bar *all* offsite noncommercial signs within the MSSSD and other special sign districts. Given the availability of other areas of the City for noncommercial signs and the content-neutral character of the prohibition, such a regulation would be substantially analogous to Los Angeles' ban on all signs on public property, and would therefore be constitutional under *City Council* v. *Taxpayers for Vincent, supra,* 466 U.S. 789, 811-812 [80 L.Ed.2d 772, 791-792].

However, we decline to employ such drastic judicial surgery. Not only would it remove such legitimate, content-neutral exceptions as public notices and traffic control devices, but the resulting legislation would be far more restrictive of First Amendment protected expression and thereby inconsistent with the intent behind section 603 to permit a varied spectrum of ideological expression, as long as it is "temporary."

## DISPOSITION

The judgment is reversed. The cause is remanded to the trial court with directions to grant the City's application for injunctive relief in a manner consistent with the views herein expressed.

Rouse, Acting P. J., and Benson, J., concurred.

A petition for a rehearing was denied July 10, 1987